**HUMAN DEVELOPMENT ASSOCIATION,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**District 6, International Union of Industrial, Service, Transport and Health Employees, Intervenor.**

No. 89–1551.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 18, 1990.

Decided July 9, 1991.

Martin Gringer, Melville, N.Y., for petitioner.

Jonathan Walters, Philadelphia, Pa., for intervenor.

Scott D. MacDonald, Attorney, N.L.R.B., with whom Aileen A. Armstrong, Deputy Associate General Counsel, and Peter Winkler, Supervisory Atty., N.L.R.B., were on the brief, Washington, D.C., for respondent. Marion L. Griffin also entered an appearance, Washington, D.C., for respondent.

John Hogrogian and Michael Adler were on the brief, New York City, for amicus curiae urging that the petition for review be denied.

Before EDWARDS, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Dissenting opinion filed by Circuit Judge EDWARDS.

D.H. GINSBURG, Circuit Judge:

Human Development Association (HDA), a home health care provider, recognized District 6 [*] as the collective bargaining representative of its home attendant employees. The National Labor Relations Board found, however, that District 6 did not have the support of a majority of the home attendants when HDA recognized it, and therefore held that HDA engaged in an unfair labor practice in violation of §§ 8(a)(1) and 8(a)(2) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1)–(2). Those sections forbid an employer respectively (1) to interfere with the exercise of employees' right to organize or refrain from organizing, and (2) to provide financial or other support to a labor organization. The NLRB also concluded that, by entering into a collective bargaining agreement with District 6 and by enforcing the union security clause of that agreement, HDA violated §§ 8(a)(1), 8(a)(2), and 8(a)(3) of the Act, 29 U.S.C. § 158(a)(1)–(3). The relevant parts of § 8(a)(3) forbid an employer to discriminate in the terms and conditions of employment for the purpose of encouraging membership in a labor organization (apart from a union security clause in an agreement with a legitimate collective bargaining agent).

HDA petitions for review of the Board's order, claiming that the Board erred in finding that District 6 did not have majority support when HDA recognized it. First, HDA argues that the Board can no longer apply its dual card doctrine, under which the Board did not count as District 6 supporters six HDA employees who signed cards both for District 6 and for another union. Second, HDA challenges the Board's decision to reject as evidence of

timely support photostatic copies of union cards that were signed after HDA recognized District 6. HDA claims that this decision is not supported by substantial evidence.

Because of a clerical error, the Board did not serve District 6 with an unfair labor practice complaint within the limitations period. District 6 participated in the Board proceedings, however, as "Party to the Contract"; it intervenes here in support of the Employer, and puts forth the additional argument that the Board improperly asserted jurisdiction over HDA.

We hold that the Board's assertion of jurisdiction was proper, and accept its reaffirmation of the dual card doctrine. We do not reach the other arguments presented because, even if successful, they would not be sufficient to sustain the claim that District 6 enjoyed majority support when HDA recognized it. Consequently, we deny the petition for review and grant the Board's cross-petition for enforcement of its order.

## I. BACKGROUND

The New York City Human Resources Administration (City) contracts with HDA to provide home care attendants for Medicaid recipients. The City pays HDA a gross amount per hour of care, and requires that HDA employees be covered by the City's employee health benefit plan. HDA hires and supervises its home attendants without day-to-day interference from the City.

In the first half of 1981, four different unions mounted campaigns to organize the home attendants working for HDA. In April, two unions no longer involved in this case filed and then withdrew a joint petition for a Board-certified representation election. A third union, District 1199, National Union of Hospital and Health Care Employees, conducted a mail campaign, which it supplemented with personal solicitations outside the HDA office and employee meetings at various sites off the premises. The fourth union, District 6, campaigned entirely by mail.

[*] International Union of Industrial, Service, Transport and Health Employees (formerly Local 6, International Federation of Health Professionals).

Believing that it had the support of a majority of the home attendants, District 1199 began in late May or early June to telephone the director of HDA in order to initiate collective bargaining. The director did not return those calls and, when eventually reached, refused to discuss District 1199's demand for collective bargaining. HDA officials instead hastened to meet with District 6, and on June 11 conducted a count of that Union's authorization cards. The count failed to show a District 6 majority, so HDA and District 6 conducted another card count on June 22. On the second try District 6 appeared to have the barest majority, 91 cards in a bargaining unit that, according to a stipulation by the Employer and the Union, consisted of 181 employees. HDA immediately recognized District 6 as the collective bargaining representative of the home attendants, and two days later signed a collective bargaining agreement containing a union security clause.

District 1199 finally demanded recognition by letter on June 29, but HDA officials refused to meet with that union. Although it never petitioned the Board for a representation election, District 1199 did charge HDA and District 6 with unfair labor practices in connection with the events of June 1981. As noted above, District 6 was not timely served with the charge.

After a 15–day hearing, an administrative law judge found that HDA had committed unfair labor practices by recognizing District 6 when that Union did not represent a majority of the home attendants, by entering into a collective bargaining agreement with the minority Union, and by enforcing the union security clause in the agreement. In finding that HDA did not represent a majority of the home attendants as of June 22, the ALJ applied the Board's dual card doctrine, subtracting from the total number of District 6 authorization cards signed by the recognition date all cards signed by employees who had also signed District 1199 authorization cards. *See, e.g., Crest Containers Corp.,* 223 N.L.R.B. 739, 741–42 (1976); *Harry Stein (Ace Sample Card Co.),* 46 N.L.R.B. 129, 130–31 (1942). This left District 6 with 94 timely cards out of a bargaining unit that the ALJ determined to number 188. On remand from the Board to reconsider the question of the Board's jurisdiction in light of its intervening decision in *Res–Care, Inc.,* 280 N.L.R.B. 670 (1986), the ALJ found that the assertion of jurisdiction remained proper.

The Board affirmed the ALJ's decision both as to jurisdiction and on the merits. *Human Dev. Ass'n,* 293 N.L.R.B. No. 140 (May 22, 1989). The Board also found that photocopies of five authorization cards signed after June 22, 1981 did not demonstrate that the signers supported District 6 on or before that date; those employees thus could not be counted in the number of District 6 supporters as of the time that HDA recognized that Union.

The Board ordered HDA not to recognize District 6 as the representative of the home attendants unless and until that Union won a Board-certified election. The Board also ordered HDA to reimburse with interest all Union dues and initiation fees paid by or withheld from employees as a result of the union security clause, except for payments by employees who signed District 6 authorization cards before the Employer's unlawful recognition forced them to join the Union.

## II. JURISDICTION

 HDA is unquestionably an "employer" within the statutory jurisdiction of the Board. *See* NLRA § 2(2), 29 U.S.C. § 152(2). Based upon the exclusion of "any State or political subdivision thereof" from the definition of an employer, however, the Board may exercise its discretion, with respect to a particular bargaining unit, not to assert jurisdiction over a statutory employer that provides services exclusively to an exempt government entity. *Res–Care, Inc.,* 280 N.L.R.B. 670 (1986); *see also Long Stretch Youth Home, Inc.,* 280 N.L.R.B. 678 (1986). In deciding whether to assert jurisdiction, the Board examines "not only the control over essential terms and conditions of employment retained by the employer, but also the

scope and degree of control exercised by the exempt entity over the employer's labor relations, to determine whether the employer in issue is capable of engaging in meaningful collective bargaining." *Res–Care,* 280 N.L.R.B. at 672. The employer bears the burden of persuading the Board not to exercise its statutory jurisdiction. *See International Ass'n of Firefighters,* 292 N.L.R.B. No. 114, at 5 (Feb. 10, 1989).

▮▮▮ A reviewing court will not disturb the Board's discretionary decision to assert its jurisdiction "absent a showing that [the Board] acted unfairly and caused substantial prejudice to the affected employer." *NLRB v. Parents & Friends of the Specialized Living Center,* 879 F.2d 1442, 1448 (7th Cir.1989). The Board nevertheless is "bound by its own rules until it changes them, including the rules that it has adopted in order to channel what would otherwise be an essentially unreviewable discretion in the deployment of its limited prosecutorial resources." *NLRB v. Kemmerer Village, Inc.,* 907 F.2d 661, 663–64 (7th Cir.1990) (citations omitted). *Cf. Hicks v. NLRB,* 880 F.2d 1396 (D.C.Cir.1989) (remanding to Board for "action ... consistent with its existing precedents or generation of a new jurisdictional rule").

District 6 argues that the Board abused its discretion by asserting jurisdiction over HDA. Specifically, the Union claims that the City so extensively controls the essential terms and conditions of employment with HDA that the Employer cannot engage in meaningful collective bargaining. Thus, argues District 6, under *Res–Care,* the Board should have declined jurisdiction in this case. We savor the irony of the Union's contention that, although it readily negotiated to collect compulsory dues from HDA employees, it cannot engage in meaningful collective bargaining on their behalf. HDA itself takes no position on the jurisdictional issue. (Although HDA does not brief the jurisdictional issue, it expressly raised that issue in the Statement of Issues supporting its petition for review. Thus the rule of *Illinois Bell Telephone Co. v. FCC,* 911 F.2d 776, 786 (D.C.Cir.1990) ("An intervening party may join issue only on a matter that has been brought before the court by another party"), does not affect our consideration of the issue.)

## A. *Res–Care and Long Stretch*

The two leading cases in this area, which were decided on the same day, illustrate the fact-intensive nature of the Board's jurisdictional inquiry. In *Res–Care* the Board declined to assert jurisdiction although the employer was solely responsible for "hiring, firing, demotions, and transfers," and had final authority over grievances. *Id.* at 674. Referring to "a core group of 'basic bargaining subjects,'" the Board held that "if an employer does not have the final say on the entire package of employee compensation, i.e., wages and fringe benefits, meaningful bargaining is not possible." *Id.*

The employer in *Res–Care* operated a Job Corps center under a cost-plus contract with the United States Department of Labor (DOL). Before awarding the contract, the DOL had to approve the employer's budget proposal line by line. The budget set out job classifications, minimum and maximum salary levels for each grade of job, and a detailed statement of personnel policies and benefits, including compensatory time, overtime, severance pay, holidays, vacation, probationary employment, and sick leave. The DOL also had to approve hiring procedures and selection criteria for bargaining unit employees, as well as individual hiring decisions for senior and supervisory staff.

Once the contract was in force, the DOL had to approve any changes in wages or benefits. If the employer paid a higher wage or provided more benefits than the DOL had approved, the Department could reject the added expenditure and reduce its contract payment to the employer. Under these circumstances, the Board found that the "ultimate authority to determine primary terms and conditions of employment" lay with the DOL and not with the employer.

In *Long Stretch Youth Home, Inc.,* 280 N.L.R.B. 678 (1986), the Board distinguished *Res–Care* and asserted jurisdiction

over the employer. First, the Board noted that, although the employer in *Long Stretch* was required to submit salary and benefit proposals to the Maryland Social Services Administration and to provide certain benefits, the agency did not control the exact levels of wages and benefits. *Id.* at 681. Second, the employer's funding was not cost-plus, as in *Res–Care*, but rather per-resident, and thus was not directly tied to the wage and benefit levels submitted to the agency. *Id.* at 681–82. Although the contract provided "an effective ceiling on [employee compensation] by limiting the . . . employer's total budget," it did not impose "specific limits on employee compensation expenditures." *Id.* at 682 n. 14.

### B. Development of the Res–Care Analysis

In the past several years the Board has narrowed the distance between *Res–Care* and *Long Stretch,* and asserted jurisdiction in the lion's share of the cases. Of the thirty-two cases to which it has applied the *Res–Care* analysis, the Board has declined jurisdiction in only six, including *Res–Care. See* Appendix following this opinion. Rather than applying any single-factor test, the Board determines whether, in the circumstances of each case, an exempt entity controls the economic terms and conditions of the labor relationship so as to preclude meaningful collective bargaining. *Trailways Commuter Transit, Inc.,* 284 N.L.R.B. 935, 935 (1987). Accordingly, the Board assesses whether the employer or the exempt entity has the "final say over the wages and fringe benefits" of its employees. *International Ass'n of Firefighters,* 292 N.L.R.B. No. 114, slip op. at 5. *See Res–Care,* 280 N.L.R.B. at 674.

For the Board to exercise its jurisdiction, the employer must retain some control over wages and benefits, rather than merely administer a compensation package prescribed by its government contract. The Board distinguishes between contracts that base funding upon a specific wage schedule, *e.g., PHP Healthcare Corp.,* 285 N.L.R.B. 182, 183–84 (1987), and contracts that merely set an "effective ceiling" on the compensation an employer may offer its

employees. *Long Stretch,* 280 N.L.R.B. at 682 n. 14. *See, e.g., Community Transit Servs., Inc.,* 290 N.L.R.B. 1167 (1988). In each of the six cases in which the Board has declined jurisdiction, the employer's contract with the government agency set out exact levels for wages and fringe benefits, which the employer could not alter without the approval of the agency. *Career Sys. Dev. Corp.,* 301 N.L.R.B. No. 60 (Jan. 30, 1991) (contract essentially same as in *Res–Care* ) (explained in *Career Sys. Dev. Corp.,* 301 N.L.R.B. No. 59, slip op. at 1 n. 1 (Jan. 30, 1991); *Southwest Ambulance of Cal., Inc.,* 295 N.L.R.B. No. 21, slip op. at 2–3, 6 n. 8 (June 15, 1989); *Thums Long Beach Co.,* 295 N.L.R.B. No. 18, slip op. at 6, 11–12 (June 15, 1989); *Correctional Medical Sys., Inc.,* 289 N.L.R.B. 810, 811–13 (1988); *PHP,* 285 N.L.R.B. at 183–84; *Res–Care,* 280 N.L.R.B. at 673, 674 n. 22. *Cf. also Hicks v. NLRB,* 880 F.2d 1396, 1398 (D.C.Cir.1989), *remanding Florence J. Hicks,* 290 N.L.R.B. 751 (1988), *on remand,* 302 N.L.R.B. No. 116 (Apr. 30, 1991) (reasserting jurisdiction).

The Board has previously asserted jurisdiction over other employers subject to contracts with labor cost provisions similar to those in HDA's contract with the City. In *Parents & Friends of the Specialized Living Center,* 286 N.L.R.B. 511 (1987), *enforced,* 879 F.2d 1442 (7th Cir.1989), the state prescribed an hourly mean wage rate for a residential facility but provided funding per diem. 879 F.2d at 1445–46. The allocation of wages and benefits to specific individuals was within the employer's control, as were wage ranges, sick leave, vacation, and holiday pay. *Id.* at 1451. The employer did not need prior approval to make most wage changes, nor to add benefits within the funding level. Hiring, firing, discipline, and other personnel decisions were also largely within the employer's discretion. *Id.* In these circumstances, both the Board and the court of appeals found that meaningful bargaining was possible.

The employer in another case furnished bus drivers to a public transportation au-

thority. *Community Transit*, 290 N.L.R.B. 1167. The contract provided for (1) a fixed fee for supervisory and maintenance operating costs, (2) a fixed management fee, and (3) a variable cost fee for "Vehicle Operator Revenue Labor." *Id.* at 1168. This last sum provided for payment to the employer of $7.685 per vehicle service hour; that amount encompassed wages, fringe benefits, and "indirect labor costs." *Id.* It was "unclear ... whether [the employer could] transfer funds allotted to one purpose to cover expenses incurred in another area." *Id.*

The Board found that the employer could bargain meaningfully within the effective limitation on wages imposed by the reimbursement rate. Apparently softening the declared requirement of control over "the entire package of employee compensation," *Res–Care*, 280 N.L.R.B. at 674, the Board held that it need not find that the employer controls "each of the economic aspects" of the labor relationship, but only that the employer "exercise[s] control over economic terms and conditions of employment, rather than control over solely noneconomic terms." *Community Transit*, 290 N.L.R.B. at 1170 n. 5. In the Board's view, the employer's lesser authority over the economic terms and conditions of employment was offset by its extensive control over non-economic terms, such as work rules. *Id.* at 1169–70.

In a third case, the Seventh Circuit affirmed the Board's assertion of jurisdiction over an employer that was compensated per diem for each child sheltered in its foster home, with contractual limits on fringe benefits and other items. *NLRB v. Kemmerer Village, Inc.*, 907 F.2d 661 (7th Cir.1990), *enforcing* 296 N.L.R.B. No. 56 (Aug. 31, 1989). Judge Posner, writing for the court, pinpointed the rather exaggerated dilemma claimed by an employer in HDA's position:

> Kemmerer does not have a free hand in setting employee compensation, true; but who does? ... In a competitive market competition limits the wages that firms are willing to pay. In a regulated market, the regulatory agency tries to simulate the effects of competition[.] ...

> [T]he state does not fix the wages that Kemmerer pays, and so far as appears there is as much play in the joints as in other regulated markets.

*Id.* at 664.

From our review of these and the other cases listed in the Appendix, we see that the jurisdictional issue before us turns upon whether HDA's contract with the City allows the Employer sufficient autonomy and flexibility to support the Board's assertion of jurisdiction. We turn now to that question.

### C. *HDA's Ability to Engage in Meaningful Collective Bargaining*

■ District 6 argues that the City has the "final say" over HDA's wage levels. The contract clearly provides for payment of a flat sum per hour of service provided, with a higher rate of reimbursement for attendant hours spent caring for two or more recipients. The contract also provides minimum pay scales for attendants caring for one or more than one recipient, the lower minimum being the federal minimum wage as of the contract date.

Board precedent makes clear that an effective ceiling imposed by a public funding scheme does not deprive an employer of the ability to bargain if the employer can set wages at different levels beneath that ceiling. Indeed, District 6 negotiated a 30 cent per hour raise for senior attendants, and imposed a seniority differential about which the contract with the City is silent. Because home attendant salaries are so near the minimum wage, HDA does not have the potential wage range enjoyed by the employer in some other cases, *e.g.*, *Community Interactions—Bucks County, Inc.*, 288 N.L.R.B. 1029, 1032 (1988). It would be an arrogation of the Board's policy-making responsibility, however, for the court to require the NLRB to withhold the protection of the Act from low-paid employees on the ground that there is too little spread between the federal minimum wage and the highest wage they could potentially negotiate in a collective bargaining agreement.

As evidence that the City specifically mandates the HDA wage scale, District 6 offers a 1983 memorandum in which the City informed HDA that the rate of compensation per hour of service provided would be raised seven percent in the coming year. In fact, however, HDA's significant discretion appears plainly from the very same memorandum, which illustrates several sample compensation schemes allocating the seven percent funding increase in different ways.

This informational memorandum does not ordain any particular allocation of the increase in funding, nor does the contract give the City the right to veto a collective bargaining agreement that HDA negotiates. The City distributed the memorandum in order to provide accounting advice to its contractors and to alert those who might otherwise commit themselves to compensation levels for which they would not be fully reimbursed.

When it examines a proposed agreement, the City's role is similarly advisory rather than coercive. HDA can sign any agreement that it wants to sign, but risks bargaining away more compensation than it will be able to pay out of City funds. *See Dynaelectron Corp., Aerospace Operations Div.*, 286 N.L.R.B. 302, 304 (1987). The flexibility available to HDA within the limits of its contract with the City also appears from the different pay scales it negotiated with District 6 to reflect various distinctions, such as relative seniority, among the home attendants.

District 6 also insists that the City's provision of health insurance for home attendants makes meaningful collective bargaining impossible. As the Board stated in *Community Transit*, however, an employer need not control all of the economic terms and conditions of employment as long as it controls at least some of them. 290 N.L.R.B. at 1170 n. 5. Health insurance is hardly a universal or an indispensable element of the employer-employee relationship; its availability for negotiation is not the sine qua non of meaningful bargaining. HDA has full discretion to provide benefits between the statutorily mandated floor (social security, unemployment insurance, worker's compensation, and disability insurance) and the cap in its contract with the City, which limits only aggregate employee benefits (to 18% of aggregate employee salaries). Thus, for example, a union might bargain for supplemental health insurance or for compensatory time off, as it prefers. This affords substantial "play in the joints." *Kemmerer Village*, 907 F.2d at 664.

District 6 argues that the City's control of HDA is pervasive outside the realm of wages and benefits, but the Union points only to trivial or irrelevant phenomena. The Board has understandably excluded from its *Res–Care* analysis minutiae such as the City's mandating the time sheets to be used, along with other types of operational controls that do not significantly affect labor relations within the bargaining unit. *Community Interactions*, 288 N.L.R.B. at 1032 n. 12; *Long Stretch*, 280 N.L.R.B. at 682 n. 15; *Res–Care*, 280 N.L.R.B. at 674 n. 22. The City reviews the selection of the top administrative officers of HDA, in order to ensure compliance with minimum qualification levels, and the contract apportions administrative staff according to the number of clients served. These limitations upon personnel outside the bargaining unit bear too remote a relation to HDA's control over the home attendants inside the bargaining unit, however, to be relevant to the *Res–Care* analysis.

Of course, as District 6 argues, the number of clients funded determines—as a practical, not as a contractual matter—the number of attendants HDA can hire, but this point is patently tautological. No labor contractor can practically employ people for whom there is no work. That is irrelevant to the terms and conditions of employment of those whom it does hire.

HDA controls all other areas of the labor relationship, to the virtual exclusion of the City. Hiring, firing, and discipline are entirely HDA functions. HDA sets its own policies for sick leave, holiday pay eligibility, vacation, benefit (compassionate) leave, and other subjects. It sets its own seniori-

ty policy and the probationary period for its employees, and has complete control over work rules. The City does set bare-bones minimum qualifications for attendants, *cf. Trailways Commuter Transit*, 284 N.L.R.B. at 937 (1987) (setting minimum qualifications not significant), and it also reviews unresolved client grievances, presumably in order to prevent abusive treatment.

The Board has never declined jurisdiction under *Res–Care* where the government contract did not spell out specific wage and benefit levels. The Board has always asserted jurisdiction over employers having contracts that provided for some form of gross payment to cover labor costs per hour or day of service provided. The exact location of the jurisdictional line drawn by the Board seems to have moved closer to *Res–Care* and farther from *Long Stretch* since those cases were decided five years ago. That line is the Board's to draw, however, so long as it is not drawn arbitrarily. In this case, the Board had and gave good reasons for putting HDA on the *Long Stretch* side of the line. We affirm its exercise of jurisdiction.

## III. THE DUAL CARD DOCTRINE

HDA and District 6 argue that the Board improperly subtracted from District 6's apparent majority those authorization cards that were signed by employees who also signed cards for District 1199. The Employer and the Union insist that an apparent majority is enough in light of *Bruckner Nursing Home, Inc.*, 262 N.L.R.B. 955 (1982). They claim that the Board cannot now hold that an employer commits an unfair labor practice by recognizing and bargaining with a union just because the union did not actually have the unambiguous support of a majority of the employees in the appropriate bargaining unit.

### A. *The Vitality of the Dual Card Doctrine*

■ Under the NLRA, an employer may recognize a union as an exclusive collective bargaining agent only if that union enjoys the support of a majority of the employees in the relevant bargaining unit. *Interna-*

*tional Ladies' Garment Workers' Union v. NLRB (Bernhard–Altmann Texas Corp.)*, 366 U.S. 731, 737, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961). By recognizing and bargaining with a minority union, an employer provides forbidden aid to that union and interferes with the employees' right to select their own bargaining representative; the employer thus violates §§ 8(a)(1) and 8(a)(2) of the NLRA. *Id.* at 737–38, 81 S.Ct. at 1607. The employer's knowledge or ignorance of the union's minority status is irrelevant to the question whether the recognition constitutes an unfair labor practice. *Id.* at 739, 81 S.Ct. at 1608.

■ Although an employer may permissibly use a variety of methods to determine the sentiments of its employees, the Supreme Court and the Board have long expressed a preference for the Board-conducted representation . election. *Linden Lumber Div., Summer & Co. v. NLRB*, 419 U.S. 301, 304, 95 S.Ct. 429, 431, 42 L.Ed.2d 465 (1974); *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 596, 602, 89 S.Ct. 1918, 1930, 1934, 23 L.Ed.2d 547 (1969). When an employer recognizes a union without the confirmation of a representation election, it assumes the risk of mistaking the extent of the union's support, and of committing the unfair labor practices associated with recognition of a minority union. *Bernhard–Altmann*, 366 U.S. at 738–39, 81 S.Ct. at 1607–08.

■ An employer that does not want to go through an election may lessen this risk by requiring the union to present signed authorization cards from a majority of the employees in the bargaining unit. *See Gissel Packing*, 395 U.S. at 597, 89 S.Ct. at 1931. The existence of a valid card majority at the time of recognition depends upon (1) the validity of the authorization cards presented by the union, and (2) the contours of the relevant bargaining unit. Because both of these elements can readily engender disputes, an employer's recognition of one union frequently leads a rival union to file unfair labor practice charges against the employer and the union it recognized.

■ For nearly fifty years the Board's policy has been that no union may count towards a majority any authorization card that was signed by an employee who also signed a card for another union, *see, e.g., Crest Containers Corp.,* 223 N.L.R.B. 739 (1976); *Harry Stein (Ace Sample Card Co.),* 46 N.L.R.B. 129, 130–31 (1942), unless other evidence clearly indicates that the employee intended the later to repudiate the earlier-signed card. *Crest Containers,* 223 N.L.R.B. at 741 & n. 5; *Wavecrest Home for Adults,* 217 N.L.R.B. 227 (1975). Nevertheless HDA and District 6 contend that the Board's continued application of the dual card doctrine is inconsistent with its decision in *Bruckner,* in which the Board clarified the standards governing an employer's right to recognize a majority union despite the presence of a question concerning representation (QCR).

The Board has long forbidden an employer to recognize any union while a "real question concerning … representation" is unresolved, mandating strict neutrality on the part of the employer so as to preserve the integrity of the election process. *Midwest Piping & Supply Co.,* 63 N.L.R.B. 1060, 1070 (1945). Originally, the Board would find a QCR triggering strict neutrality only if an election petition had been filed. *See Bruckner,* 262 N.L.R.B. at 956. Indeed, the term "question concerning representation" derives from the finding that the statute requires before the Board conducts a representation election, a finding that can be triggered only by a petition. *See* NLRA § 9(c), 29 U.S.C. § 159(c). The NLRB will find a QCR necessitating an election only upon a particular threshold showing: a union petitioning for an election must show the support of at least 30% of the employees in the relevant bargaining unit; an employer petitioning in the initial

organizing setting must show that a union claims majority support. 29 C.F.R. § 101.18 (1990).

Over the years, in applying the requirement of strict neutrality enunciated in *Midwest Piping,* the Board relaxed the petition requirement in favor of an open-ended, if not standardless, inquiry into the existence of a QCR. *See Bruckner,* 262 N.L.R.B. at 956. *Bruckner* presented an extreme but not a unique case. The ALJ had found that the employer committed an unfair labor practice by recognizing a union that had gotten signed authorization cards from 80 to 90 percent of the employees in a 125–person bargaining unit, simply because, when the employer recognized the majority union, a rival union had collected two signed authorization cards. The rival had not petitioned for an election nor, obviously, could it have filed a valid petition.

In *Bruckner* the Board declared that a QCR could be raised for the purposes of the *Midwest Piping* doctrine only by the filing of a valid election petition. Thus, while the Board disowned the progeny of *Midwest Piping,* it left the original case intact: the pendency of an election petition raises a QCR that, until resolved, precludes the employer from voluntarily recognizing any union. Absent a pending election petition, an employer is not barred from recognizing a union on the basis of cards simply because a rival union is in the picture.**

Before *Bruckner* the Board had clearly distinguished between a challenge, based upon dual cards, to an employer-recognized union's majority support, and a challenge to an employer's strict neutrality under *Midwest Piping.* For example, in rejecting an employer's defense to a § 8(a)(2) charge based upon its purported unawareness that the rival union was conducting an organizing campaign, the Board explained:

---

** Our dissenting colleague mistakenly claims that the Board relies upon *dual* cards in "other organizational contexts," dis. op. at 673, but can provide no example. He apparently misconstrues what the Board said in *Bruckner:* "The phenomenon of dual cards can no longer solely justify our absolute refusal to rely on cards in *Midwest Piping* situations, particularly since we regard them as a reliable means of ascertaining the wishes of a majority of employees in other

organizational contexts." 262 N.L.R.B. at 958. (1) The antecedent of "them" is clearly "cards," not "dual cards." The Board routinely relies upon authorization cards as indicators of employee preferences. (2) What the Board found no longer justified is not the refusal to credit dual cards but "the absolute refusal to rely on cards" to establish a majority if a rival union has even one signed card.

Such knowledge, or the want of it, comes into play as a relevant consideration only in a so-called *Midwest Piping* type of situation, where the majority card count of the union is either established or is assumed, and the theory of the alleged violation is that the employer has acted unlawfully within the meaning of Section 8(a)(1) and (2) by extending recognition to one of two competing unions at a time when he was on notice that a question concerning representation existed. But [when] the union granted recognition was a minority union, nothing further must be shown to support a finding of a statutory violation. For majority designation is a *sine qua non* to lawful recognition of an exclusive bargaining agent under the statute.

*Crest Containers*, 223 N.L.R.B. at 741–42 (applying dual card doctrine to find unfair labor practice). After *Bruckner* the Board uniformly applied the dual card doctrine when faced with a challenge to the majority status of a union that an employer had recognized during an initial organizing campaign involving multiple unions. *Caro Bags, Inc.*, 285 N.L.R.B. 656, 669–70 (1987); *Windsor Place Corp.*, 276 N.L.R.B. 445, 445 n. 1 (1985).

In *Flatbush Manor Care Center*, 287 N.L.R.B. 457 (1987), the Board made explicit the rationale behind that unwavering practice.*** The Board considered and rejected precisely the arguments that HDA and District 6 make here. While it reaffirmed its adherence to *Bruckner*, the Board found a § 8(a)(2) violation based upon the employer's voluntary recognition of a union whose apparent majority was

undercut when the dual cards were subtracted. *Id.* at 458. The Board "agree[d] with the [ALJ] that the case turns on the application of the Board's dual-card theory," and "agree[d] with the [ALJ's] reasoning" in finding that dual cards could not be counted. *Id.* That reasoning conclusively disposed of the arguments raised in this case:

> Respondents assert that the Board's decision in *Bruckner Nursing Home* ... requires a finding that inasmuch as [the rival union] did not file a petition, demand recognition, or notify the Employer of its interest in representing the employees, the "imposition of strict employer neutrality" was therefore not triggered, and accordingly, the Employer was free to recognize [the favored union] on a showing that it represented a majority of the employees.... I cannot agree that *Bruckner Nursing Home* changes prevailing Board concepts on the issue of dual cards.

*Id.* at 471.

The *Flatbush Manor* opinion goes on to reiterate *Bruckner*'s requirement that a recognized union represent an "uncoerced, unassisted *majority,*" *id.* (emphasis in original), and repeats the warning in *Bruckner* that the Board's curtailment of the *Midwest Piping* doctrine did not change the "longstanding principle" that an employer violates § 8(a)(2) when it recognizes a union that "does not actually have majority support." *Id.* (citing *Bruckner*, 262 N.L.R.B. at 957 n. 13). "[T]he facts that no petition was filed, no 'rival claim' for representation was made, and no request for recognition demanded ... are

---

*** The "conflicting signals" that the dissent so labors to find, dis. op. at 673–74, do not appear in any Board decision that actually addresses the dual card issue. The cases that the dissent cites as evidence of a supposedly inconsistent approach to the dual card doctrine in the wake of *Bruckner* share one characteristic with that case: none of them presented a claim that dual cards undermined the card majority of a recognized union. *See Rollins Transp. Co.*, 296 N.L.R.B. No. 108 (Sept. 28, 1989) (decided after *Human Dev. Ass'n*) (representation election petition not barred by an employer's recognition of a "majority" union chosen from among several unions conducting simultaneous organizing

campaigns; possibility that recognized union's card majority undercut by dual cards one reason for allowing representation election to proceed); *Film Consortium, Inc.*, 268 N.L.R.B. 436, 436 n. 4 (1983) (*Midwest Piping* strict neutrality case notes difference between theory of § 8(a)(2) violation and theory based upon recognition of minority union); *Great Southern Construction*, 266 N.L.R.B. 364, 365 n. 5 (1983) (no cards offered into evidence; no party raised dual card theory); *see also Flatbush Manor*, 287 N.L.R.B. at 471 n. 69 (noting that Board omitted dual card analysis in *Great Southern* because case litigated solely under *Midwest Piping*).

irrelevant to the question of whether [the union] in fact represented a majority of the employees ... when it was recognized by the Employer." *Id.* The discussion concludes by holding that *"Bruckner* is inapplicable here because [the union recognized by the employer] did not, in fact represent a majority of the employees." *Id.* at 472.

We find the distinction drawn in *Flatbush Manor* to be sufficient for the purpose of our limited substantive review of the way in which the Board applies its own prior interpretation of the NLRA. The Board's decision in *Bruckner* to cut *Midwest Piping* back to its roots in no way requires the concomitant demise of the dual card doctrine. *Flatbush Manor,* 287 N.L.R.B. at 471; *Bruckner,* 262 N.L.R.B. at 957 n. 13. *Midwest Piping* and *Bruckner* address only an employer's ability to recognize a majority union in the face of a possible QCR.

The dual card doctrine, on the other hand, governs the Board's assessment of a union's claim to majority status regardless of whether a rival union can raise a QCR. Indeed, the Board fashioned the dual card doctrine years before it introduced the *Midwest Piping* version of strict neutrality. *See Harry Stein,* 46 N.L.R.B. at 130–31. While, for obvious reasons, a charge of non-neutrality under *Midwest Piping* often appears together with a challenge to the majority status of a recognized union, they are independent violations and the Board treats them as such.

> Under the *Midwest Piping* doctrine, lack of majority status is not a necessary element of proof of the violation, and proof that the recognized union possesses majority support is not a defense to the alleged violation. See, e.g., *Bruckner....* Recognition of a union that does not possess majority status is a separate theory of violation under Sec. 8(a)(2)....

*Film Consortium, Inc.,* 268 N.L.R.B. 436, 436 n. 4 (1983). *See also, e.g., Caro Bags,* 285 N.L.R.B. 656; *Hartz Mountain Corp.,* 228 N.L.R.B. 492, 492, 526–30 (1977).

*Bruckner* is not an endorsement of a greater role for the employer in the multiple union context, but is rather an acknowledgement that in some cases it may be sensible and efficient for the employer to recognize one union although there is a rival union in the picture. *Bruckner* is designed to enable the employer to do the sensible and efficient thing, however, only in the service of the employees' unambiguous choice, and within the limits of the "less reliable" device of authorization cards. *Bruckner,* 262 N.L.R.B. at 958.

Nor does the dual card doctrine "put[ ] an employer in an absolutely impossible position," as District 6 argues here. If the employer doubts the majority support of a union seeking recognition on the basis of cards, the employer need not recognize the union until it is certified by the Board after an election. *See Bruckner,* 262 N.L.R.B. at 957 n. 13. Furthermore, in that circumstance the burden is on the union, not the employer, to petition for an election. *Linden Lumber,* 419 U.S. at 310, 95 S.Ct. at 434.

In sum, the Board's continued application of the dual card doctrine is not "irrational or inconsistent with the Act," *NLRB v. Financial Inst. Employees, Local 1182,* 475 U.S. 192, 202, 106 S.Ct. 1007, 1012, 89 L.Ed.2d 151 (1986). Accordingly we defer to its judgment in adhering to the doctrine post-*Bruckner.*

## B. *Specificity in Application of Settled Policy*

HDA and District 6 argue that, even if *Bruckner* does not preclude the Board from applying the dual card doctrine, we must remand this case to the Board because it did not acknowledge and specifically dispose of the argument in its brief decision. The Board did state, however, that it had considered the decision of the ALJ in light of the exceptions raised; this "is sufficient under the circumstances here, to satisfy any applicable requirement of specific format for the Board's opinions." *Division 1142, Amalgamated Ass'n of Street Elec. Ry. & Motor Coach Employees v. NLRB,* 294 F.2d 264, 268 (D.C.Cir.1961); *see also NLRB v. Vista Hill Found.,* 639 F.2d 479, 482–83 (9th

Cir.1980). Indeed, "where the legal issue raised is insubstantial—where, for example, despite the litigant's claim there is no apparent conflict in earlier agency cases," the Board need not even specifically address an exception to the decision of an ALJ. *International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 111 v. NLRB*, 792 F.2d 241, 247–48 (D.C.Cir.1986) (Scalia, J.); *cf. Atlanta Gas Light Co. v. FERC*, 756 F.2d 191, 198 (D.C. Cir.1985) (Scalia, J.) (no basis for overturning agency action when petitioner's objection raised "non-problem"). In this case, a remand is not compelled merely because the Board did not recite in full only to reject once again, less than eighteen months after rejecting it in *Flatbush Manor*, a threshold objection to a doctrine applied without interruption for nearly fifty years.

Although "the better practice," *see NLRB v. Process Corp.*, 412 F.2d 215, 217 (7th Cir.1969), might have been to identify and, citing *Flatbush Manor*, to brush off the argument based upon *Bruckner*, the ruling under review leaves no room for doubt that the Board applied its known position on dual cards to the case before it. Hence HDA was not prejudiced by the Board's terseness. *See American President Lines, Ltd. v. NLRB*, 340 F.2d 490, 492 (9th Cir.1965).

### C. *Remedial Discretion*

 HDA argues that, in any event, it should not be required to repay the dues it deducted from the wages of employees who were not District 6 members prior to the negotiation of the union security clause. We do not believe that the Board has here abused its "broad discretion in devising remedies to undo the effects of violations of the Act," *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 316, 99 S.Ct. 1123,

1132, 59 L.Ed.2d 333 (1979). The reimbursement order here can "fairly be said to effectuate the policies of the Act," *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964), namely (1) that employees and not their employer should select their collective bargaining representative, and (2) that an employer should not force its employees to join a union not chosen by the majority of their peers. We shall therefore enforce the Board's order in full.

### IV. CONCLUSION

HDA makes the desperate claim that substantial evidence does not support the Board's decision to exclude five cards from the District 6 total because they were signed after the date of the card count. HDA also challenges the ALJ's inclusion of two employees in the bargaining unit. We need resolve neither the late card nor the bargaining unit issue. Even if both were resolved in the Employer's favor, District 6 would have only 94 cards. Regardless of whether the bargaining unit comprised 190 employees, as the ALJ found, or 188 employees, as HDA and District 6 contend, the Union falls short of demonstrating the support of a majority of the employees.

The Board properly asserted jurisdiction and applied the dual card doctrine. Accordingly, we deny the petition for review, and the order of the National Labor Relations Board is in all respects

*Enforced.*

### APPENDIX

NLRB Decisions Applying *Res–Care, Inc.*, 280 N.L.R.B. 670 (1986) *

A. Jurisdiction Asserted
1. *Florence J. Hicks*, 302 N.L.R.B. No. 116 (Apr. 30, 1991)

---

* We omit cases in which the Board rejected an exception based upon *Res–Care* as untimely, including *Kemmerer Village, Inc.*, 296 N.L.R.B. No. 56 (Aug. 31, 1989) (summary judgment), *enforced*, 907 F.2d 661 (7th Cir.1990), in which the court of appeals reached the merits of the *Res–Care* argument and found that the Board had properly asserted jurisdiction. We also omit *Auto Bus, Inc.*, 293 N.L.R.B. No. 106 (Apr.

26, 1989), in which the Board denied the employer's motion to dismiss on all grounds including one predicated upon *Res–Care*, but addressed only another ground upon which the ALJ had based a partial dismissal, and *Vanguard Tours, Inc.*, 300 N.L.R.B. No. 30 (Sept. 28, 1990), in which the Board asserted jurisdiction but noted that the employer did not file an exception to the ALJ's *Res–Care* ruling.

2. *Williams Servs., Inc.,* 302 N.L.R.B. No. 81 (Apr. 11, 1991)

3. *Career Sys. Dev. Corp.,* 301 N.L.R.B. No. 59 (Jan. 30, 1991)

4. *Stanley E. Stein,* 300 N.L.R.B. No. 68 (Oct. 31, 1990)

5. *Correctional Medical Sys., Inc.,* 299 N.L.R.B. No. 95 (Aug. 31, 1990)

6. *R.W. Harmon & Sons, Inc.,* 297 N.L.R.B. No. 81 (Jan. 29, 1990)

7. *Human Dev. Ass'n,* 293 N.L.R.B. No. 140 (May 22, 1989)

8. *International Ass'n of Firefighters,* 292 N.L.R.B. No. 114 (Feb. 10, 1989), *supp. dec.,* 297 N.L.R.B. No. 146 (Mar. 9, 1990)

9. *Robinson Bus Serv., Inc.,* 292 N.L.R.B. No. 20 (Dec. 29, 1988)

10. *Community Transit Servs., Inc.,* 290 N.L.R.B. 1167 (1988)

11. *Koba Assocs., Inc.,* 289 N.L.R.B. 390 (1988)

12. *Staff Builders Servs., Inc.,* 289 N.L.R.B. 373 (1988), *enforced,* 879 F.2d 1484 (7th Cir.1989)

13. *Old Dominion Sec., Inc.,* 289 N.L.R.B. 81 (1988)

14. *Community Interactions—Bucks County, Inc.,* 288 N.L.R.B. 1029 (1988)

15. *Wolf Trap Found. for the Performing Arts,* 287 N.L.R.B. 1040, *supp. dec.,* 289 N.L.R.B. 760 (1988)

16. *Animal Humane Soc'y of S. Jersey, Inc.,* 287 N.L.R.B. 50 (1987)

17. *Columbus Area Community Mental Health Center, Inc.,* 286 N.L.R.B. 1340 (1987)

18. *Parents & Friends of the Specialized Living Center,* 286 N.L.R.B. 511 (1987), *enforced,* 879 F.2d 1442 (7th Cir.1989)

19. *Dynaelectron Corp., Aerospace Operations Div.,* 286 N.L.R.B. 302 (1987)

20. *Princeton Memorial Hosp.,* 285 N.L.R.B. 1016 (1987), *supp. dec.,* 294 N.L.R.B. No. 47 (May 31, 1989)

21. *Trailways Commuter Transit, Inc.,* 284 N.L.R.B. 935 (1987)

22. *Community Living,* 285 N.L.R.B. 312 (1987)

23. *Dickinson–Iron Community Action Agency,* 283 N.L.R.B. 1029 (1987)

24. *ARA Servs., Inc.,* 283 N.L.R.B. 602 (1987)

25. *Rustman Bus Co., Inc.,* 282 N.L.R.B. 152 (1986)

26. *Long Stretch Youth Home, Inc.,* 280 N.L.R.B. 678 (1986)

B. Jurisdiction Declined

1. *Career Sys. Dev. Corp.,* 301 N.L.R.B. No. 60 (Jan. 30, 1991) (explained in 301 N.L.R.B. No. 59, slip op. at 1 n. 1)

2. *Southwest Ambulance of Cal., Inc.,* 295 N.L.R.B. No. 21 (June 15, 1989)

3. *Thums Long Beach Co.,* 295 N.L.R.B. No. 18 (June 15, 1989)

4. *Correctional Medical Sys., Inc.,* 289 N.L.R.B. 810 (1988)

5. *PHP Healthcare Corp.,* 285 N.L.R.B. 182 (1987)

6. *Res–Care, Inc.,* 280 N.L.R.B. 670 (1986)

EDWARDS: Circuit Judge, dissenting:

In this case, the National Labor Relations Board ("NLRB" or "Board") found the petitioner, Human Development Association ("HDA"), guilty of an unfair labor practice following HDA's voluntary recognition of District 6, International Union of Industrial, Service, Transport and Health Employees ("District 6"), as the exclusive collective bargaining agent for persons employed by HDA in personal home care service. In securing recognition, District 6 had demonstrated majority support by presenting union authorization cards executed by employees in the designated bargaining unit. The Board held, however, that at the time when HDA recognized District 6, the union did not have majority support because several of the employees who had signed authorization cards for District 6 also had signed authorization cards for a rival union.

Although there is no evidence that HDA knew of the existence of these "dual cards," nor is there any evidence that HDA unlawfully favored District 6 over the rival union, the Board apparently adhered to a so-called "dual-card" doctrine in finding

that HDA had committed an unfair labor practice in recognizing District 6. The problem with this judgment is that the Board purported to abandon the dual-card doctrine in *Abraham Grossman d/b/a Bruckner Nursing Home*, 262 N.L.R.B. 955 (1982) (*"Bruckner"*), thus making it inapplicable here. Accordingly, I would grant the petition for review and remand this case to the Board for further proceedings. At a minimum, this case should be remanded to allow the Board to explain how *Bruckner* and an application of the dual-card doctrine can be harmonized.

Beginning in 1945, the Board adopted the so-called *"Midwest Piping"* doctrine to determine whether an employer had committed an unfair labor practice when recognizing one union in a rival-union, initial-organization context. *See Midwest Piping & Supply Co.*, 63 N.L.R.B. 1060 (1945). In these situations, *Midwest Piping* required the employer to maintain strict neutrality toward the rival unions attempting to organize the employees so long as there existed a "real question concerning ... representation." *Id.* at 1070. In conjunction with this rule, the Board has employed a *Midwest Piping*-type analysis even in situations where the employer is unaware of the rival union if the recognized union has relied on dual cards to secure bargaining rights. Thus, in such situations, the Board sometimes has refused to count dual cards toward the determination of majority support, because the ambiguity produced by such dual cards sometimes has created a real question concerning representation. What is noteworthy, however, is that even though dual cards sometimes have been found to be fatally ambiguous, they never have been found to be inherently unreliable as a measure of employee sentiment. *See Crest Containers*, 223 N.L.R.B. 739, 741 (1976) (espousing the "dual-card" doctrine).

In 1982, the Board rejected the *Midwest Piping* doctrine in favor of a new test. *See Bruckner*, 262 N.L.R.B. at 957. In *Bruckner*, the Board discarded the "real-question-concerning-representation-test" and instead held that an employer would commit an unfair labor practice only if it recognized a union after a representation peti-

tion had been filed with the Board or if it unlawfully coerced employees or assisted the prevailing union. The Board's decision to depart from *Midwest Piping* has created the confusion which necessitated the instant litigation. On the one hand, not only is the dual-card doctrine inconsistent with the Board's policy enunciated in *Bruckner*, but *Bruckner* expressly repudiated the dual-card doctrine. On the other hand, while some post-*Bruckner* Board cases reflect antipathy toward the dual-card doctrine, there are also some post-*Bruckner* decisions that are consistent with the dual-card doctrine.

In my view, the *Bruckner* decision obviated the need for the dual-card doctrine. The Board stated that it would "no longer find 8(a)(2) violations in rival unions initial organizing situations when an employer recognizes a labor organization which represents an uncoerced, unassisted majority, before a valid petition for an election has been filed with the Board." *Bruckner*, 262 N.L.R.B. at 957. The dual-card doctrine is facially inconsistent with this new rule insofar as it holds an employer guilty of an unfair labor practice for recognizing a union even when no rival petition has been filed. The majority may be right in suggesting that the Board's holding in *Bruckner* and its application of the dual card doctrine can be harmonized. But the Board has not done it in this case. The case should therefore be returned to the Board.

## I.

If an employer recognizes a union as a sole representative of its employees before the union has gained a majority, the employer's good faith will not constitute a defense. *International Ladies Garment Workers' Union v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). Thus, if a "dual card" *never* may be used to establish a union's majority status, then an employer will commit an unfair labor practice if it recognizes a union whose purported majority rests in part on dual cards, *i.e.*, without regard to whether there is a rival union on the scene. The majority assumes this to be

the controlling principle in this case; however, I can find no real support for this position in the Board's case law, and it seems unfathomable in light of the Board's decision in *Bruckner*. The simple truth is that the Board never has said that dual cards cannot be used as a measure of union support.

The dual-card doctrine was a forerunner of *Midwest Piping*. *See, e.g., Harry Stein & Arthur Calder (Ace Sample Card Co.)*, 46 N.L.R.B. 129, 130–31 (1942). Under the doctrine as first enunciated, the Board vitiated an employer's recognition of a union if it could not determine from the record that the employees who signed "duplicate cards" desired exclusive representation by the recognized, rather than a rival, union. Admittedly, the dual-card doctrine is theoretically distinct from *Midwest Piping;* however, the latter has subsumed the former in practice. That is, the dual-card doctrine almost always arises only in connection with a claim that the employer has unlawfully recognized a particular union in a situation in which a rival union is present. And, to the extent that dual cards have been an issue, the Board has never applied a *per se* test; the Board always has looked to see whether the record contains

> evidence ... of sufficient reliability and probative force to clearly dissipate the ambivalence as to intent that is inherent in dual card designations and to leave no doubt that, at the time material to the determination of the issue of majority status, the dual card signer intended only one of his dual cards ... to evidence his designation of a bargaining agent.

*Crest Containers*, 223 N.L.R.B. at 741.

In *Crest Containers*, the Board refused to recognize union authorization cards when the signators of those cards also signed cards for a rival union. The dual-card doctrine fit neatly into the *Midwest Piping* framework: where dual cards existed, there might be a real question concerning representation. *Crest Containers*, 223 N.L.R.B. at 741 ("[W]here an employee signs an authorization card for each of two unions, the card of neither union will be regarded as a valid designation that may be counted toward majority, as it is not then possible to determine from the cards which of the two unions the employee has selected as an exclusive bargaining agent.") Thus, in the context of *Midwest Piping*'s real-question-concerning-representation test, the dual-card doctrine made perfect sense.[1]

The Board eliminated the real-question-concerning-representation test when it issued *Bruckner*, 262 N.L.R.B. at 957. In *Bruckner*, the Board criticized the *Midwest Piping* test for providing no guidance as to just what constituted a "real question concerning representation." *See id.* The Board realized that the *Midwest Piping* test "frequently allowed a minority union possessing a few cards to forestall the recognition of a majority union in an effort to buy time to gather more support for itself or frustrate its rivals." *Id.* at 956. Indeed, before the decision in *Bruckner*, a number of courts already had begun to reject *Midwest Piping*. *See id.* at 957 ("[C]ircuit courts refused to enforce many of our decisions based on 'modified' *Midwest Piping* violations.... [T]he courts took the view that the question concerning representation was resolved whenever an employer recognized a bona fide majority claimant and had not actually aided ... the recognized labor organization. At the point an unassisted majority union had been recognized, the courts considered the matter settled, and the question concerning representation resolved.") (footnotes omitted). Sensitive to these criticisms, the Board conceded that its goals had "not been accomplished" by *Midwest Piping*, see *Bruckner*, 262 N.L.R.B. at 957, and accordingly rejected *Midwest Piping* in categorical terms:

> [W]e will no longer find 8(a)(2) violations in rival union, initial organizing situations when an employer recognizes a labor organization which represents an uncoerced, unassisted majority, before a

---

1. Although the Administrative Law Judge in *Crest Containers* purports to distinguish the dual-card doctrine from *Midwest Piping*, his decision appears merely to extend *Midwest Piping* to cover situations where the employer is unaware of a rival union.

valid petition for an election has been filed with the Board.

*Id.* (footnote omitted).

The dual-card doctrine, in the context of *Midwest Piping*'s real-question-concerning-representation test, no longer makes sense in the face of *Bruckner*'s express repudiation of *Midwest Piping*. Under current Board law, until a rival union files a valid petition with the Board, an employer is free to recognize a labor organization which represents an *uncoerced, unassisted* majority. *Id.* The central concern of *Midwest Piping, i.e.,* whether a "real question concerning representation" exists, no longer enters into the equation:

> [A]n employer will no longer have to guess whether a real question concerning representation has been raised but will be able to recognize a labor organization unless it has received notice of a properly filed petition.

*Id.* If a rival union fears defeat, that union is free to file a petition with the Board (assuming the rival union can demonstrate the minimum 30% support necessary before a petition may be filed), at which point the employer "must refrain from recognizing any of the rival unions." *Id.*

> Making the filing of a valid petition the operative event for the imposition of strict employer neutrality in rival union, initial organizing situations will establish a clearly defined rule of conduct and encourage both free choice and industrial stability.

*Id.* To this end, the Board promised to process petitions "in the most expeditious manner possible." *Id.*

The existence of dual cards provided the prototypical example of a situation in which employers had to guess whether there was a real question concerning representation. Indeed, the employer is put in a ridiculous situation because, usually, there is no way to determine the presence of "dual cards." But under *Bruckner*, "an employer will no longer have to guess." *Id.* The rival union can protect its interests by the simple expediency of filing a petition with the Board, provided it can demonstrate at least 30% support. And, where the rival union

"cannot command the support of even 30 percent of the unit, it will no longer be permitted to forestall an employer's recognition of another labor organization which represents an uncoerced majority of employees." *Id.* Because dual cards no longer affect whether the employer may recognize one of two rival unions, the dual-card doctrine is no longer relevant to rival-union, initial-organization situations.

## II.

The analysis does not end here, for *Bruckner* explicitly deals with the dual card problem. Having struck down *Midwest Piping*, the Board was aware that it needed to address the dual-card doctrine as well. The Board concluded that, in the absence of the strict *Midwest Piping* rule, the dual-card doctrine had lost its underpinnings:

> [O]ur new approach provides a satisfactory answer to problems created by execution of dual authorization cards. It is our experience that employees confronted by solicitations from rival unions will frequently sign authorization cards for more than one union. Dual cards reflect the competing organizational campaigns. They may indicate shifting employee sentiments or employee desire to be represented by either of two rival unions. In this situation, authorization cards are less reliable as indications of employee preference. When a petition supported by a 30–percent showing of interest has been filed by one union, the reliability of a rival's expression of a card majority is sufficiently doubtful to require resolution of the competing claims through the Board's election process....
> .... The phenomenon of dual cards in a rival union organizational setting must be taken into account, but can no longer solely justify our absolute refusal to rely on cards in *Midwest Piping* situations, particularly since we regard them as a reliable means of ascertaining the wishes of a majority of employees in other organizational contexts.

*Id.* at 958. Clearly, the Board recognized the need to allow employers to rely on dual

cards. Although the Board conceded that dual cards may be *less* reliable, the Board refused to go so far as to deem dual cards *un*reliable. In fact, the reliability of those cards becomes sufficiently doubtful to force an election only when a rival union is able to muster the 30% support needed to justify a petition. Just as dual cards are regarded "as a reliable means of ascertaining the wishes of a majority of employees in other organizational contexts," so must they be regarded as a reliable means of ascertaining the wishes of a majority of employees in this organizational setting.

Thus, not only is *Bruckner* facially inconsistent with the dual-card doctrine, but the Board in *Bruckner* expressly disavowed the dual-card doctrine. Footnote 13, upon which the Board's counsel places primary reliance, does nothing to alter either of these conclusions. Footnote 13 comes at the end of text that says, "we will no longer find 8(a)(2) violations in rival union, initial organizing situations when an employer recognizes a labor organization which represents an *uncoerced, unassisted* majority, before a valid petition for an election has been filed with the Board," *id.* at 957 (emphasis added); the footnote then reads as follows:

> [W]e emphasize that an employer will still be found liable under Sec. 8(a)(2) for recognizing a labor organization which does not actually have majority employee support. This longstanding principle applies in either a single or rival union organizational context and is unaffected by the revised *Midwest Piping* doctrine announced in this case. For instance, if an occasion arises where an employer is faced with recognition demands by two unions, both of which claim to possess valid authorization card majority support, the employer must beware the risk of violating Sec. 8(a)(2) by recognizing either union even though no petition has been filed. In such a situation, there is a possibility that the claimed majority support could in fact be nonexistent.

*Id.* at 957 n. 13 (citation omitted). This footnote does not revive the dual-card doctrine. The most obvious "possibility" that a claimed majority does not exist will arise

in cases where there has been unlawful "coercion" or "assistance." But the presence of dual cards does not, without more, demonstrate unlawful coercion or assistance.

Standing on its own, footnote 13 might be read, as Board counsel reads it, to be consistent with the dual-card doctrine. But such a reading would force us to disregard the Board's more explicit pronouncements that dual cards are only "less reliable" and raise a significant question only when a rival union has demonstrated the minimum 30% support needed to substantiate a representation petition. *See id.* at 958. The Board made its position plain when it stated in the text of *Bruckner* that

> [u]nder our new formulation, the duty of strict employer neutrality and the necessity for a Board-conducted election attach *only* when a properly supported petition has been filed by one or more of the competing labor organizations. Where no petition has been filed, an employer will be free to grant recognition to a labor organization with an uncoerced majority, so long as it does not render assistance of the type which would otherwise violate section 8(a)(2) of the Act.

*Id.* at 958 (emphasis added). Unless and until the rival union files a representation petition, the employer is free to recognize a union which comes to the employer and demonstrates majority support (even by use of dual cards), so long as that employer does not provide unlawful coercion or assistance. Never having filed a petition, a rival union cannot later claim that the successful union's authorization cards were inadmissible dual cards. The rival union must first muster 30% support and file a petition. Only then will the dual cards receive heightened scrutiny.

### III.

If *Bruckner* were the last word on the dual-card doctrine, I would conclude that the doctrine no longer applies in *Midwest Piping* situations. However, the Board subsequently has given conflicting signals as to whether the dual-card doctrine survives *Bruckner*.

On the one hand, the Board has suggested that the dual-card doctrine continues to have vitality apart from *Midwest Piping.* One Board panel actually cited *Bruckner*'s footnote 13, albeit without any discussion, as authority for its decision to exclude dual cards. *See Flatbush Manor Care Center,* 287 N.L.R.B. 457, 458 (1987) (affirming the Administrative Law Judge's assertion that he could not "agree that *Bruc[k]ner Nursing Home* changes prevailing Board concepts on the issue of dual cards"). Two other panels have tacitly affirmed the dual-card doctrine without so much as mentioning *Bruckner.* *See Caro Bags, Inc.,* 285 N.L.R.B. 656, 669 (1987) (adopting an Administrative Law Judge's finding that *Crest Containers* is the last word on the dual-card doctrine without discussing *Bruckner* ); *Windsor Place Corp.,* 276 N.L.R.B. 445, 449 (1985) (same).

On the other hand, the Board also has suggested that it views *Bruckner* as signalling the demise of the dual-card doctrine. For example, in *Great Southern Construction, Inc.,* the Board relied on *Bruckner* in allowing an employer

> to recognize whichever of the two Unions *it* deemed represented a majority of its unit employees. True, the Board, in *Bruckner,* cautioned that the safe course for an employer faced with rival claims of majority support would be to refuse recognition. However, this was addressed to the employer's risk of violating Section 8(a)(2) by recognizing a union which did not in fact enjoy majority support.... [Where] there is no evidence that [the] ... Union did not have majority status [the] ... Employer properly recognized the labor organization it perceived represented a majority of its employees.

266 N.L.R.B. 364, 365 (1983) (emphasis added). The Board did not specifically address the dual-card question since the parties had not raised the issue, *see id.* at 365 n. 5, but the Board's position, as in *Bruckner,* seemed to be that the employer *may* recognize the union which demonstrates majority support to the employer, despite the later discovery of dual cards, in the absence of a properly filed election petition. *See also The Film Consortium, Inc.,* 268 N.L.R.B.

436 (1983) (citing *Bruckner* for the proposition that "the filing of a valid petition is 'the operative event for the imposition of strict employer neutrality in rival union, initial organizing situations' ").

The Board's own confusion recently culminated in *Rollins Transportation Systems, Inc.,* 296 N.L.R.B. No. 108, 132 L.R.R.M. 1185 (1989). Although *Rollins* was a representation (not an unfair labor practice) case, the Board offered some views that are pertinent to the issue at hand:

> Nothing in our holding that no recognition bar exists in the conduct of an election should be construed to cast doubt on the legitimacy of the Employer's granting recognition to the Intervenor. Likewise, *this holding should not lead employers in other factually similar situations to be reluctant, for fear of violating the Act, to grant recognition to unions that have demonstrated majority support.* Indeed, we agree with our dissenting colleague that the grant of recognition here would be lawful under Bruckner because the intervenor was recognized before the Employer had knowledge of the Petitioner and its petition. Knowledge is a critical element in determining the lawfulness of an employer's granting recognition in the rival union, initial organizing unfair labor practice setting.

*Id.,* 132 L.R.R.M. at 1187–88 n. 5 (emphasis added). If knowledge of the rival union is a critical element of an unfair labor practice charge, the Board could not possibly mean to impute knowledge of the dual nature of the authorization cards to an employer who only learned of the dual cards *after* it had recognized the union. Once the union demonstrates majority support to the employer, that employer should be justified in recognizing that union.

The upshot of these cases is simply that the Board has failed to adopt and explain any coherent position on the dual-card doctrine. In such a situation, it is not for this court to establish Board policy. When the Board waivers between two diametrically opposed policies and fails to explain coherently the legal standard it purports to apply, we require the Board to choose the course to which it will adhere in the future.

*See, e.g., United Food & Commercial Wkrs. v. NLRB,* 880 F.2d 1422, 1435–36 (D.C.Cir.1989) (when "the Board has decided to apply a new approach ... then we ask the Board to explain why it has made the shift and to identify those factors that will control the determination"). In *United Food and Commercial Workers,* we were unable to ascertain the Board's legal standard regarding an employer's duty to bargain with its employees over a relocation decision. *Id.* at 1423, 1436. Without precisely indicating its policy on the matter, the Board reached a conclusion that was consistent with some past decisions, but inconsistent with others. *See id.* at 1437–38. We rejected the Board's approach:

> As disputes arise, such as the current one, that force the Board to chart a course in the more ambiguous or disputed territory of ... [a legal] test, the Board must accept responsibility for clarifying and identifying the standards that are guiding its decisions.

*Id.* at 1436. The court also held that the proper place for such an explanation was with the Board, not the appellate court:

> We do not mean to intimate that the Board could not rationally find ... [the different cases] distinguishable. The Board's counsel points to some arguably plausible points of distinction. But we again state that it is not up to us to imagine what distinctions the Board may have been relying on to decide the present case as it did, in apparent tension with its previous decision.... The Board's summary disposition of this case reveals no Board attention to the possible inconsistencies, and thus we are left with an apparent conflict.

*Id.* at 1437–38 (emphasis and citation omitted); *see also Hicks v. NLRB,* 880 F.2d 1396, 1400 (D.C.Cir.1989) (remand proper "for further action either consistent with [the Board's] existing precedents or for generation of a new jurisdictional rule"); *Pacific N.W. Newspaper Guild, Local 82 v. NLRB,* 877 F.2d 998, 1001, 1003 (D.C.Cir. 1989) (where Board's application of law is "inconsistent and inadequately explained" and the Board "fails to explain coherently its prior precedent" this court will remand for further explanation).

The serious uncertainty created by *Bruckner* and its progeny necessitates reconsideration of the dual-card doctrine by the Board.

### IV.

*Bruckner* appears to abolish the dual-card doctrine in *Midwest Piping*-type cases. The Board's subsequent decisions have obscured that holding to such an extent that it is impossible to discern the Board's precise position regarding dual cards. The majority opinion in this case may be an adequate resolution of the *Bruckner* issue; the problem is that the majority relies on a rationale of its own making, not one offered by the Board. It may be that the majority, by fiat, has now fixed the Board's case law by simply declaring it to be as the majority states it. If the Board acquiesces in this position, then the law will no longer be in disarray. But this approach, while arguably expedient, is flatly at odds with the law of the circuit requiring a remand.

Respectfully, I dissent.