NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

KEMMERER VILLAGE,
INCORPORATED,
Respondent.

Nos. 89-3063, 89-3361.

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 1990.
Decided July 16, 1990.

Timothy A. Bridge, Robbins, Schwartz, Nicholas, Lifton & Taylor, Chicago, Ill., for Kemmerer Village Inc.

Aileen A. Armstrong, David Seid, William A. Baudler, Howard E. Perlstein, N.L.R.B., Appellate Court—Enforcement Litigation, Washington, D.C., Joseph H. Solien, N.L.R.B., St. Louis, Mo., for N.L.R.B.

Before POSNER, EASTERBROOK,
and MANION, Circuit Judges.

**662**

POSNER, Circuit Judge.

Kemmerer Village, Inc., a nonprofit corporation controlled by two presbyteries (governing bodies within the Presbyterian Church), operates a foster home in Illinois funded in large part by the Illinois Department of Children and Family Services. Kemmerer claims to be exempt from the National Labor Relations Act on three grounds: that it is a "political subdivision" of a state and hence expressly exempted by 29 U.S.C. § 152(2); that it is so far controlled by the Department of Children and Family Services as to be incapable of engaging in meaningful collective bargaining, and hence should be treated as exempt under the doctrine the Labor Board announced in *Res–Care, Inc.*, 280 N.L.R.B. 670, 674 (1986), and we discussed most recently in *Staff Builders Services, Inc. v. NLRB*, 879 F.2d 1484, 1486 (7th Cir.1989); and finally that it is a religious organization, whose labor relations *NLRB v. Catholic Bishop*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), places beyond the Labor Board's power in order to prevent the entanglement of government in religion.

Grounds 1 and 3 cannot both be right; nor 2 and 3. If Kemmerer is a political subdivision it cannot also be (outside of Scotland, anyway) a Presbyterian religious body that must be protected from becoming entangled with government. And if the government already controls Kemmerer's labor relations (ground 2), without protest from it, how can Kemmerer resist, on grounds of autonomy rooted in the First Amendment, the Labor Board's claim to share in that control?

 Ground 3 in any event has no possible merit. Kemmerer is controlled by organs of the Presbyterian Church, it is true, and by tradition its director is a Presbyterian minister, who conducts occasional services for the children. But that is the end of the Presbyterian involvement. That Kemmerer is organized under Illinois's nonprofit corporation statute rather than under the state's religious corporation statute is unimportant, *Pime v. Loyola University of Chicago*, 803 F.2d 351, 358 (7th Cir.1986) (concurring opinion), but not the fact that Kemmerer's articles of incorporation require (no doubt to make it eligible to receive state funds) that it operate as a nonsectarian enterprise. Kemmerer does not inquire into the religion of the children whom it takes in, or seek to indoctrinate them in the tenets of the Presbyterian faith (or any other faith), or require its employees to be Presbyterians. It is true that in *Catholic Bishop* the union was not trying to organize priests or nuns, but instead lay employees. But those lay employees were the teachers in the archdiocese's parochial schools, and such schools have (though not exclusively) a religious mission. Kemmerer appears to have no religious mission at all and therefore cannot get even to the threshold of showing how being forced to bargain collectively with its employees could impede that mission. This case is governed by *St. Elizabeth Hospital v. NLRB*, 715 F.2d 1193, 1196–97 (7th Cir. 1983), which holds that a hospital owned and operated by a Catholic religious order was not exempt from the National Labor Relations Act, because "the record here reveals that the hospital operates essentially as a nonreligious institution." *Id.* at 1196. Only here we can drop the qualification "essentially."

 Ground 1 has no possible merit either. Kemmerer is not a political subdivision—a term, incidentally, that may be narrower than public agency. Compare 29 U.S.C. § 630(b) (Age Discrimination in Employment Act), discussed in *Schaefer v. Transportation Media, Inc.*, 859 F.2d 1251 (7th Cir.1988). The state did not create or acquire Kemmerer; it is not organized as a municipal corporation or other public entity; it is heavily subsidized by the state but if *that* is the criterion then every tobacco farmer in the nation is a political subdivision. Advanced thinkers revel in the ambiguities of the public-private distinction in our heavily taxed, heavily subsidized nation, but section 152(2) would be unusable if construed as an invitation to that particular dance.

Granted, it is not always clear whether one is dealing with a private agency or a political subdivision even in the rather nom-

inalistic sense that we think appropriate in order to make the statute at least minimally definite, because agencies don't always come with the appropriate labels clearly affixed. The gas distributor held to be a political subdivision in *NLRB v. Natural Gas Utility District*, 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971), could have been classified either way, but apparently what was decisive was that the power to appoint its governing board had been lodged in a public official. In *Jefferson County Community Center for Developmental Disabilities, Inc. v. NLRB*, 732 F.2d 122 (10th Cir.1984), a private institution for retarded and handicapped individuals was held not to be a political subdivision, even though its bylaws required that a minority of the directors be appointed from the ranks of designated public agencies. There are no public directors here. There is nothing but a state subsidy, and what is implicit in a state subsidy—that the enterprise is seeking to accomplish·something that the state wants accomplished. That cannot be enough, for if it were, our subsidized farmer would be a political subdivision. As the Supreme Court has said in a related context, "That a private entity performs a function which serves the public does not make its acts state action." *Rendell–Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982) (footnote omitted). Nor is it argued that the state's funding of Kemmerer is a subterfuge to enable the state to avoid providing an essential public service directly. *Id.* at 842 n. 7, 102 S.Ct. at 2772 n. 7; *Spencer v. Lee*, 864 F.2d 1376 (7th Cir.1989) (en banc).

■ Which leaves ground 2. This ground might seem to be an extension of 1, but it is not. The political subdivision exemption is designed, so far as we are able to surmise (there is no useful legislative history), to spare the states and their subdivisions the burden and travail of having to bargain collectively with their employees, except insofar as a state voluntarily assumes the burden by authorizing public employees to bargain collectively. The exemption created by the Board for cases where meaningful collective bargaining is

impossible picks up where the political subdivision exemption leaves off. The state is assumed to have the whip hand by virtue of the political subdivision exemption, and if it controls a private employer's labor relations it would be futile to make the employer bargain with his workers. He would just be a cat's paw. Any real bargaining would be with the state, and it is not required to bargain. The Board does not want to waste its time and (other) limited resources monitoring organizing efforts that can lead nowhere, and we have thus upheld the doctrine as a reasonable systematization of the Board's inherent discretion to allocate its limited resources efficiently. *Staff Builders Services, Inc. v. NLRB, supra*, 879 F.2d at 1486. Of course if it were really true that organizing efforts could lead nowhere because the employer had no power over its labor relations, one would not expect any unions to be interested, so maybe the doctrine is superfluous. Maybe it is not just superfluous but wrong, because workers are interested in other things besides wages and benefits, such as job security and working conditions—the only things that unions of federal employees can bargain over, and yet those unions are numerous and contentious. Yet if "an employer does not have the final say on the entire package of employee compensation, i.e., wages and fringe benefits," the doctrine comes into play. *Res–Care, Inc., supra*, 280 N.L.R.B. at 674. Remember, though,. that this is a doctrine of prioritization, and may be entirely reasonable on that basis.

■ But enough of this. No one questions the validity of the doctrine in this proceeding. The only question is whether the Board misapplied the doctrine in the present case. This is a question for us because the Board is bound by its own rules until it changes them, *Continental Web Press, Inc. v. NLRB*, 742 F.2d 1087, 1093 (7th Cir.1984), including the rules that it has adopted in order to channel what would otherwise be an essentially unreviewable discretion in the deployment of its limited prosecutorial resources, *State Bank of India v. NLRB*, 808 F.2d 526, 537 (7th

Cir.1986), as distinct from the ad hoc exercise of that discretion, *Staff Builders Services, Inc. v. NLRB, supra,* 879 F.2d at 1486–87.

About 70 percent of the budget of Kemmerer's foster home comes from the Illinois Department of Children and Family Services. It comes in the form of per diem compensation per child, and thus depends on the number of children and on the size of the per diem compensation. The Department fixes this figure annually on the basis of Kemmerer's "reasonable costs," which are a function of its actual costs and of the costs of similar foster homes. Certain cost items are automatically disallowed, including fringe benefits in excess of 25 percent of salaries, and all severance costs. The nature of the funding scheme gives the Department substantial control over Kemmerer's wages and benefits, but not so much control as to render collective bargaining over employee compensation (the focus of the Board's doctrine) futile. Kemmerer does not have a free hand in setting employee compensation, true; but who does? In a competitive market, competition limits the wages that firms are willing to pay. In a regulated market, the regulatory agency tries to simulate the effects of competition, and limits wages through its power to disallow imprudent or unreasonable expenditures. No one would argue that an employer is exempt from the Labor Board's jurisdiction by virtue of operating in a highly competitive market, or that a public utility is exempt by virtue of being subject to a regulatory scheme designed to simulate competitive constraints. Kemmerer is like a public utility. The state tries to control Kemmerer's costs, and to the extent it succeeds this limits Kemmerer's freedom to pay high wages. But the state does not fix the wages that Kemmerer pays, and so far as appears there is as much play in the joints as in other regulated markets, or for that matter in competitive markets. The case is unlike *Res–Care.* There the Department of Labor had to "approve the initial amounts for wages and benefits that Res–Care [which operated a job corps center under a contract with the Department] proposes in its budget, as well as wage ranges and benefit levels proposed by Res–Care; and retains ultimate discretion to approve or disapprove any change in wage rates, benefit levels, or personnel policies." 280 N.L.R.B. at 674 (footnotes omitted).

Some cases, illustrated in this circuit by *NLRB v. Chicago Youth Centers,* 616 F.2d 1028, 1029 (7th Cir.1980) (per curiam), suggest that if the nominal employer has *no* control over his labor relations, that control lying instead with a political subdivision, the subdivision "is a joint employer with the private agency, and the latter shares the former's exemption under" 29 U.S.C. § 152(2). Either this formulation converts the Board's discretionary doctrine, a systematization we have said of its prosecutorial discretion, into a rule of law interpreting section 152(2); or it requires proof of a level of control even greater than that in the Board's doctrine; or it illustrates the lawyer's passion for conceptual proliferation; or it is a confused allusion to what we are tempted to call the real joint-employer *doctrine,* by which the Board tries to bring to book employers who seek to evade the National Labor Relations Act by using an employment agency or its equivalent as a screen between them and "their" workers, as in *NLRB v. Western Temporary Services, Inc.,* 821 F.2d 1258 (7th Cir.1987). We need not try to unravel this skein, since it is apparent that Kemmerer could not prevail under any version of the joint employer doctrine—which in any event its brief mentions only in passing.

The Board's order commanding Kemmerer to bargain with the union is

Enforced.