ARA SERVICES, INCORPORATED, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Communications Workers of America, AFL–CIO, Intervenor.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ARA SERVICES, INCORPORATED, Respondent,

Communications Workers of America, AFL–CIO, Intervenor.

Nos. 95–1201, 95–1332.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 29, 1995.

Decided Dec. 5, 1995.

**ARGUED:** David William Miller, Baker & Daniels, Indianapolis, Indiana, for Petitioner. David A. Seid, National Labor Relations Board, Washington, D.C., for Respondent. John David James, Smith, Follin & James, L.L.P., Greensboro, North Carolina, for Intervenor. **ON BRIEF:** Todd M. Nierman, Baker & Daniels, Indianapolis, Indiana, for Petitioner. Frederick L. Feinstein, General Counsel, Linda Sher, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Paul J. Spielberg, Deputy Assistant General Counsel, National Labor Relations Board, Washington, D.C., for Respondent.

Before WILKINSON, WILLIAMS, and MOTZ, Circuit Judges.

Enforcement denied by published opinion. Judge WILKINSON wrote the majority opinion, in which Judge WILLIAMS joined. Judge MOTZ wrote an opinion, concurring in part and dissenting in part.

## OPINION

WILKINSON, Circuit Judge:

In this case we must decide whether the National Labor Relations Board ("the Board") properly asserted jurisdiction over petitioner ARA Services, Inc. ("ARA").

ARA provides food services at the University of North Carolina at Greensboro ("UNCG"), a "political subdivision" exempt from the Board's jurisdiction. 29 U.S.C. § 152(2). ARA contends that under its contract with UNCG, UNCG regulates ARA's employment terms so extensively that ARA is unable to engage in meaningful collective bargaining, thus triggering the jurisdictional exception developed by the Board for employers whose employment conditions are substantially controlled by statutorily exempt entities. *Res–Care, Inc.*, 280 N.L.R.B. 670 (1986).

We agree with ARA. The contract between ARA and UNCG grants UNCG veto authority over any modification of ARA's wages, fringe benefits, and staffing levels. The Board's exercise of jurisdiction over ARA thus forces collective bargaining where control over the basic subjects of negotiation lies not with the employer, but with a political subdivision statutorily exempt from the Board's jurisdiction. Accordingly, we deny enforcement of the Board's bargaining order.

## I.

On March 1, 1993, the Communication Workers of America ("CWA") filed a petition with the NLRB seeking to represent certain of ARA's employees at UNCG. At the time, ARA's provision of food services at UNCG was governed by a five-year contract, covering 1989 to 1994 ("the 1989 agreement"). Under this agreement, ARA received a fixed fee for each student who purchased a meal plan, with the fee level set by a line-item budget that was negotiated annually between ARA and UNCG.

ARA opposed CWA's petition on jurisdictional grounds, contending that under the 1989 agreement UNCG controlled ARA's terms of employment. ARA urged the Board to decline jurisdiction based on its exception for private employers whose employment relations are substantially regulat-

ed by exempt entities. On April 2, 1993, the Regional Director of the NLRB rejected ARA's jurisdictional arguments. The Director ruled that UNCG did not control ARA's wages or staffing levels to the necessary degree, and that the annual budget renegotiation showed UNCG did not have "absolute veto power or final say-so" over ARA's employment terms. On September 29, 1993, a divided panel of the NLRB summarily affirmed the Regional Director's ruling and asserted jurisdiction over ARA.

ARA and UNCG executed a new five-year contract on June 24, 1994 ("the 1994 agreement"), the terms of which make up the substance of this appeal. The 1994 agreement took effect on August 1, 1994, following expiration of the 1989 contract. The current accord increases UNCG's control over ARA's employment terms by restricting ARA's ability to unilaterally alter its wages, fringe benefits, or staffing levels. In light of the changes effected by the 1994 agreement, ARA urged the Board to reconsider its decision asserting jurisdiction. On December 27, 1994, the Board granted ARA's motion to reopen the record, but summarily held that ARA could still engage in meaningful collective bargaining under the 1994 contract.[1]

By this time, CWA had prevailed in a representation election and had been certified as the bargaining representative. ARA, though, refused to bargain with CWA, based primarily on its view that the Board lacked jurisdiction. CWA filed a charge, and on January 27, 1995, the Board granted summary judgment against ARA, finding that it had violated the Act by refusing to negotiate. ARA appeals from the Board's bargaining order.

## II.

The National Labor Relations Act exempts from its coverage "State[s] or political subdivision[s] thereof." 29 U.S.C. § 152(2). The

---

1. The Board's opinion reads:

   Employer's motion to reopen the record is granted. However, having considered Employer's proffered evidence, we find that Employer retains the ability to meaningfully bargain with Petitioner over economic and non economic terms and conditions of employment of Employer's employees at the University of North Carolina at Greensboro. See, generally, *Dynaelectron Corp.*, 286 NLRB 302 (1987). Accordingly, we reaffirm ou[r] September 29, 1993 Order asserting jurisdiction over Employer.

Board has long extended this exemption to private employers providing services for exempt political subdivisions, where the exempt entity effectively controls the primary employment terms. *See NLRB v. Princeton Memorial Hosp.*, 939 F.2d 174, 177 n. 3 (4th Cir.1991); *National Transp. Serv., Inc.*, 240 N.L.R.B. 565 (1979). In such situations "any apparent collective bargaining by the employer would in substance be with the (supposedly) exempt entity," *Hicks v. NLRB*, 880 F.2d 1396, 1397 (D.C.Cir.1989); *see NLRB v. Kemmerer Village, Inc.*, 907 F.2d 661, 663 (7th Cir.1990), and the same considerations underlying the statutory exemption of the public entity should also apply to the private employer. The Board's exemption thus "picks up where the political subdivision exemption leaves off." *Kemmerer Village*, 907 F.2d at 663.

In *Res–Care, Inc.*, 280 N.L.R.B. 670 (1986), the Board set forth the analysis used to determine whether it should exercise jurisdiction over private employers contracting with exempt public entities. The question under *Res–Care* is "whether the employer retain[s] sufficient control over the employment conditions of its employees to enable it to engage in ... 'meaningful' bargaining with a labor organization." *Id.* at 672. Critical to this inquiry is whether the exempt entity's controls over the employer's terms of employment are "direct" restrictions, the kind that specifically reserve to the exempt entity the final authority to determine wages, benefits, and other economic conditions of employment, or are merely "effective" restrictions, the kind that allow the employer to adjust wages and benefits as long as it remains within some general budgetary constraint. *Id.* at 674 n. 22; *Human Development Ass'n v. NLRB*, 937 F.2d 657, 662 (D.C.Cir.1991), *cert. denied*, 503 U.S. 950, 112 S.Ct. 1512, 1513, 117 L.Ed.2d 649 (1992).

When the exempt subdivision directly controls wage and benefit levels and other employment terms, the Board has declined to assert jurisdiction. *NLRB v. Career Systems Development Corp.*, 975 F.2d 99, 101 (3d Cir.1992) ("Where 'ultimate discretion' in the setting of wage rates and fringe benefits rests with the government agency rather than the employer under contract to the agency, the Board will not assert jurisdiction."); *Human Development Ass'n*, 937 F.2d at 662. This was the case in *Res–Care*, where the employer submitted a detailed budget for the Department of Labor's approval that set forth wage ranges by classification, fringe benefits, and various employment policies, and the employer could not adjust its wages or benefits without the Department's permission. The Board declined to assert jurisdiction, holding that "[w]hen an employer ... lacks the ultimate authority to determine primary terms and conditions of employment, such as wage and benefit levels, it lacks the ability to engage in the necessary 'give and take' which ... makes bargaining meaningful." *Res–Care*, 280 N.L.R.B. at 674. *See also Southwest Ambulance of California, Inc.*, 295 N.L.R.B. 125, 126 n. 8 (1989) (refusing jurisdiction where "the exempt entity sets the exact wage and benefit levels"); *PHP Healthcare Corp.*, 285 N.L.R.B. 182, 184 (1987) (refusing jurisdiction where the exempt entity "retains ultimate discretion for setting wage and benefit levels").

By contrast, when the exempt subdivision's controls over the employment terms are only of the effective variety, involving overall budgetary restrictions within which the employer can adjust individual salary and benefit levels, the Board has exercised jurisdiction. *Career Systems*, 975 F.2d at 101 ("[W]here the government agency merely establishes an overall level of compensation ... but not the wage rates and fringe benefits, the Board will assert jurisdiction."); *Human Development Ass'n*, 937 F.2d at 663 ("Board precedent makes clear that an effective ceiling imposed by a public funding scheme does not deprive an employer of the ability to bargain if the employer can set wages at different levels beneath that ceiling"); *e.g., Long Stretch Youth Home, Inc.*, 280 N.L.R.B. 678, 682 n. 14 (1986) ("[A]n effective ceiling ... limiting the private employer's total budget is not the type of control over labor relations that would cause us to decline to assert jurisdiction."). Presumably, the Board's approach reflects the fact that general budgetary constraints of this sort ultimately differ little from the market pressures that every

employer must face. *See Kemmerer Village,* 907 F.2d at 664.

Whether a given case involves direct or effective restrictions by an exempt entity may be a close call. One thing, however, seems clear. The Board has declined jurisdiction where the exempt subdivision possessed a right of approval over any change in individual wages and benefits. In cases where the Board assumed jurisdiction, the employer retained some discretion over wages, and also enjoyed substantial flexibility regarding fringe benefits and other conditions of employment. *E.g., Career Systems Devt. Corp.,* 301 N.L.R.B. 434 (1991), *enforced,* 975 F.2d 99 (3d Cir.1992) (agreement requires seeking permission before adjusting overall salary and benefit expenditures, but employer can allocate the salary and benefit budget in any manner); *Community Transit Serv., Inc.,* 290 N.L.R.B. 1167 (1988) (agreement restricts wage ranges, but employer retains flexibility to reformulate its benefits packages within an overall budget and controls all other economic and noneconomic bargaining subjects); *Community Interactions—Bucks County, Inc.,* 288 N.L.R.B. 1029 (1988) (agreement enumerates salary range, but range is so large that it leaves substantial room for negotiation, and employer can shift costs among line-items and can alter fringe benefits within an overall budget); *Dynaelectron Corp.,* 286 N.L.R.B. 302 (1987) (agreement specifies minimum wages and benefits, but employer can increase compensation without seeking approval).

### III.

The Board asks that we enforce its order asserting jurisdiction over ARA under the *Res–Care* standard. The Board contends it properly applied *Res–Care* here, because ARA possesses sufficient control over the terms and conditions of employment to enable it to engage in meaningful collective bargaining. We think, however, that the

terms of the ARA/UNCG relationship compel the opposite conclusion.

The 1994 agreement between ARA and UNCG falls squarely within the category of direct restrictions, the kind that normally prompt the Board to refuse jurisdiction.[2] The terms of the 1994 contract could not be more definite in this regard. The agreement specifies the precise starting wage rate for each employee classification, and stipulates that "[n]o changes shall be permitted in pay rates . . . for retained or newly hired employees without the University's prior permission." The contract also sets forth in detail the fringe benefits to be awarded to each employee, enumerating paid holidays, vacation days, sick leave allowances, and health insurance coverage, and specifies that "[n]o modification in these benefits, nor eligibility to receive benefits, is permitted without the University's prior approval." Moreover, the agreement prohibits ARA from "increas[ing] or decreas[ing] the staff initially assigned on duty at the University without the University's prior approval." Throughout, the contract repeatedly reaffirms in unequivocal language that UNCG retains veto authority over any attempt by ARA to adjust its wages, fringe benefits, or staffing levels from those set forth in the initial contract.

This is hardly the stuff of meaningful collective bargaining, at least as the Board has construed that standard in its rulings. The Board has never asserted jurisdiction in circumstances like this, where the contract specifies precise wage and benefit levels and the exempt governmental entity reserves the right to approve any changes therefrom. Indeed, "[i]n each of the six cases in which the Board has declined jurisdiction, the employer's contract with the government agency set out exact levels for wages and fringe benefits, which the employer could not alter without the approval of the agency." *Human Development Ass'n,* 937 F.2d at 662. Here, UNCG, not ARA, holds ultimate discretion over wages and benefits; the veto authority expressly reserved by UNCG bears no other

**2.** The parties devote considerable attention in their briefs to the terms of the old 1989 agreement, which was the subject of the Board's initial rulings in this case. The 1994 agreement displaced the 1989 contract, however, and the latter is now moot. The Board ruled on the 1994 agreement in its most recent opinion asserting jurisdiction over ARA. We thus focus our analysis on the current accord.

construction. *See Mayflower Contract Serv., Inc. v. NLRB*, 982 F.2d 1221, 1225 (8th Cir. 1993) (referring to "the kind of line-by-line veto power often cited by the NLRB when it declines to assert jurisdiction").

The only decision cited by the Board in its most recent opinion in this case, *Dynaelectron Corp.*, 286 N.L.R.B. 302 (1987), does not support the assertion of jurisdiction over ARA. In *Dynaelectron Corp.*, the employer could increase wages and benefits or modify the mix of benefits without government approval. ARA, of course, cannot in any way alter wages or benefits without UNCG's permission.

The arguments raised by the Board on this appeal are similarly unpersuasive. The Board contends that in light of the historical relationship between ARA and UNCG, the University will presumably endorse any reasonable adjustments in wages and benefits brought about by collective bargaining. We cannot accept this invitation to look past the substance of the parties' own agreement. Regardless of the actual relationship between the parties, the agreement plainly vests ultimate discretion in setting wages and benefits with UNCG. When an exempt entity reserves the veto power possessed by UNCG here, the Board has not allowed the possible approval of proposed changes to trump the express contractual terms. *See Hicks v. NLRB*, 880 F.2d 1396, 1399 (D.C.Cir.1989). Moreover, the incorporation of these provisions into the 1994 contract suggests that we pay them close attention: If ARA and UNCG only expected to continue their existing relationship, it is unclear why they took great care to change the terms of their contract.

The Board also points to a clause in the 1994 contract allegedly obligating UNCG to approve any proposed changes as long as they are "consistent with sound fiscal management." Although the agreement does contain this phrase, it does not do what the Board contends. Instead, it embodies exactly the opposite presumption, namely that UNCG possesses the right to *reject* any proposed adjustments when doing so would be consistent with UNCG's sound fiscal management—"The University reserves the right to approve or modify or deny any proposed increase or modification in wages or benefits consistent with sound fiscal management." This interpretation is borne out by the immediately preceding sentence, which reiterates that "[g]ranting approval to request[s] for increases is at the sole discretion of the University." In essence, then, the clause identified by the Board only reaffirms what the 1994 agreement communicates throughout—that UNCG possesses ultimate control over ARA's wages, benefits, and staffing levels.

We recognize that the Board enjoys considerable discretion in exercising its jurisdiction. *E.g., Career Systems*, 975 F.2d at 100–01. Nevertheless, "the Board is bound by its own rules until it changes them." *Kemmerer Village*, 907 F.2d at 663; *Mayflower Contract Serv.*, 982 F.2d at 1223 (noting that "the NLRB is 'bound by its own rules' in deciding whether to assert jurisdiction over an employer who provides services to an exempt entity"). In this case, UNCG directly controlled ARA's primary employment terms. In such situations, the Board has consistently declined jurisdiction on the basis that control of the employment conditions lies with a political subdivision statutorily exempt from the Act's coverage. Consequently, the Board erred in asserting jurisdiction over ARA, disregarding not only its own well established standards, but also the principle we articulated long ago: that "the purpose of collective bargaining is to produce an agreement and not merely to engage in talk for the sake of going through the motions." *Westinghouse Elec. Corp. v. NLRB*, 387 F.2d 542, 550 (4th Cir.1967) (en banc).

## IV.

During the pendency of this appeal, the Board issued its decision in *Management Training Corp.*, 317 N.L.R.B. No. 190 (July 28, 1995), a ruling that substantially modifies the Board's jurisdictional inquiry. In *Management Training*, the Board decided to eschew its *Res–Care* analysis and instead to assert jurisdiction whenever an employer technically falls within the statutory definition, regardless of whether an exempt political subdivision actually controls the employ-

ment terms. The Board brought this decision to our attention prior to oral argument, and now contends that if we disagree with its several rulings in this case under the *Res–Care* standard, we should remand for it to decide in the first instance whether to apply the new *Management Training* standard retroactively to this case.

While a remand may be appropriate when the Board has not made clear whether it intends for a new rule to apply retroactively, *NLRB v. Food Store Employees Union,* 417 U.S. 1, 10 & n.10, 94 S.Ct. 2074, 2080 & n. 10, 40 L.Ed.2d 612 (1974); *Blackman–Uhler Chem. Div. v. NLRB,* 561 F.2d 1118, 1119 (4th Cir.1977) (en banc) (per curiam), we need not remand if applying the new jurisdictional rule retroactively would work a "manifest injustice." *E.g., NLRB v. Viola Industries–Elevator Div., Inc.,* 979 F.2d 1384, 1396 (10th Cir.1992) (en banc). In the particular circumstances of this case, retroactive application of the *Management Training* decision would be manifestly unjust.

Courts consider several factors when deciding whether to retroactively enforce rules announced in NLRB adjudications to cases pending on appeal.[3] *See, e.g., NLRB v. Oakes Machine Corp.,* 897 F.2d 84, 90 (2d Cir.1990); *Local 900 v. NLRB,* 727 F.2d 1184, 1194–95 (D.C.Cir.1984); *Retail, Wholesale, and Dep't Store v. NLRB,* 466 F.2d 380, 389–90 (D.C.Cir.1972). Among the considerations is "one that, in practice, has

been given primary importance," namely, whether the rule proposed by the Board represents an "abrupt break with well-settled policy" or is merely an "attempt to fill a void in an unsettled area of law." *UFCW, Local No. 150–A v. NLRB,* 1 F.3d 24, 34 (D.C.Cir. 1993). If an abrupt change of administrative course is involved, retroactive application of the rule is less appropriate. *Id.; see Consolidated Freightways v. NLRB,* 892 F.2d 1052, 1059 (D.C.Cir.1989), *cert. denied,* 498 U.S. 817, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990). The *Management Training* decision falls in this camp. The ruling purports to overturn numerous court precedents and Board decisions, all of which hinge jurisdiction on whether an exempt entity substantially controls the employer's terms of employment. *See Management Training,* 317 N.L.R.B., slip op. at 7 (Member Cohen, dissenting); *e.g., Compton v. National Maritime Union,* 533 F.2d 1270, 1274–75 (1st Cir.1976); *Herbert Harvey, Inc. v. NLRB,* 424 F.2d 770 (D.C.Cir.1969); *National Transp. Serv., Inc.,* 240 N.L.R.B. 565 (1979); *Rural Fire Protection Co.,* 216 N.L.R.B. 584 (1975).

When a Board decision "creates a new rule ... by overruling past precedents relied upon by the parties," the propriety of its retroactive application is called into question. *District Lodge 64 v. NLRB,* 949 F.2d 441, 447 (D.C.Cir.1991). Presumably, ARA and UNCG had the *Res–Care* doctrine in mind when crafting the terms of the 1994 agreement. And retroactively applying the

---

**3.** In recent rulings on retroactivity principles, the Supreme Court has indicated that statutes and administrative rules ordinarily apply only prospectively absent clear intent to the contrary, *see Landgraf v. USI Film Products,* — U.S. —, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) (commenting that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result"), but that judicial rulings ordinarily apply retroactively to cases pending on direct appeal, *see Harper v. Virginia Dept. of Taxation,* — U.S. —, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). *See generally Rivers v. Roadway Express, Inc.,* — U.S. —, —, 114 S.Ct. 1510, 1519, 128 L.Ed.2d 274 (1994) (supporting " '[t]he principle that statutes operate only prospectively, while judicial decisions operate retrospectively' ") (quoting *United States v. Security Indus.*

*Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982)). The problem is complicated in the context of Board rulings, however, by the Board's general practice of using adjudication, rather than the rulemaking process, to announce new standards. *See Retail, Wholesale and Dep't Store Union v. NLRB,* 466 F.2d 380, 388–89 (D.C.Cir.1972). At least one court has recently concluded that the rationale for the retrospectivity of judicial decisions "do[es] not apply analogously to administrative agency adjudications." *Laborers' Int'l Union v. Foster Wheeler Corp.,* 26 F.3d 375, 387 n. 8 (3d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 356, 130 L.Ed.2d 311 (1994). Indeed, the fact that Board adjudication has long existed in the interstices of retroactivity law argues in favor of a case-by-case approach to such rulings, rather than an attempt to fit them within one of the above global retroactivity principles.

*Management Training* standard here, to a case pending on appeal, causes more concern than applying a new rule to the case in which it is announced. *See NLRB v. Affiliated Midwest Hosp., Inc.,* 789 F.2d 524, 530 (7th Cir.1986) ("Retroactive application is not as troublesome when the policy is applied to the case declaring it, as opposed to a case pending on appeal."); *Retail, Wholesale,* 466 F.2d at 390 ("The Supreme Court has identified a number of reasons calling for the application of a new rule to the parties to the adjudicatory proceeding in which it is first announced—reasons that do not apply with the same force to subsequent proceedings.").

Along with the impact of retroactive application on the parties, courts must also consider the statutory interest in applying a new administrative rule to a case on appeal. *See Oakes Machine,* 897 F.2d at 90; *General Am. Transp. Corp. v. ICC,* 872 F.2d 1048, 1060 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1069, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990). Here, the statutory concerns implicated by *Management Training* are modest at best. The ruling itself makes evident that the new jurisdictional standard is not statutorily compelled. Rather, its primary purpose seems to be to adopt a simple rule "to reduce the potential for litigation as much as possible." *Management Training,* 317 N.L.R.B., slip op. at 4.

Under the new rule, the Board will assert jurisdiction over employers even if control over the basic employment terms lies with a statutorily exempt political subdivision. The Board's whole basis for refusing jurisdiction in such situations prior to *Management Training,* however, was that the assertion of jurisdiction would conflict with the policies underlying the statutory exemption. Several courts had in fact suggested that asserting jurisdiction where an exempt political subdivision regulates the employment conditions would not only contradict the Board's jurisdictional standards, but would violate the statutory exemption itself. *See Board of Trustees of Memorial Hosp. v. NLRB,* 624 F.2d 177, 185 (10th Cir.1980) ("Where a private employer who has contracted to provide services to an exempt political subdivision does not retain sufficient control over the employment relationship to engage in meaningful collective bargaining, § 2(2) deprives the Board of jurisdiction because the exempt subdivision is deemed the true employer."); *see also Jefferson County Community Ctr. v. NLRB,* 732 F.2d 122, 126 (10th Cir.), *cert. denied,* 469 U.S. 1086, 105 S.Ct. 591, 83 L.Ed.2d 701 (1984); *Museum Assocs. v. NLRB,* 688 F.2d 1278, 1279 (9th Cir.1982) (per curiam). We need not now address this question. It is enough to note that there exists a question as to the new standard's statutory validity, a factor that weighs against its retroactive application.

Whatever the future resolution of this question, the parties in the present case deserve finality. More than two and a half years have already been consumed by this litigation, encompassing some six NLRB rulings of one kind or another. Remanding for yet another round of administrative proceedings and possible court appeals would not serve the ends of justice. It is clear that the Board's bargaining order is not sustainable under the standards on which the Board has ruled and on which the parties have relied. For these reasons, enforcement of the Board's order is denied.[4]

*ENFORCEMENT DENIED.*

---

4. Our good dissenting colleague contends a remand to the Board is required. The cases cited to support this proposition are inapposite. None of them mandates the needless exercise of a remand and possible further appeals when it is manifest that the retroactive application of a new NLRB rule would be improper.

Here, as we have noted, retroactive application of the new rule would be improper because: (1) this litigation has already consumed substantial time and resources; (2) the new rule was "an abrupt break with well-settled policy" reflected in decades of Board rulings and court precedent, *UFCW, Local No. 150–A,* 1 F.3d at 34; (3) the abrupt break was announced in a case in which these parties were not even litigants; (4) the retroactive application of this abrupt departure is not compelled by the policies underlying the Act; (5) the Board expressly based its prior rulings in this case on the former rule; and (6) the parties presumably relied on that former rule and the Board's heretofore consistent application of it.

Finally, the Board's new pronouncement in *Management Training* was of a broad prescriptive nature, adopted without any prior notice to these parties. Although the adjudicatory process of an agency may sometimes proceed in this fashion, the retroactive application of new rules can work

DIANA GRIBBON MOTZ, Circuit Judge, concurring in part and dissenting in part:

I concur in parts I through III of the majority opinion in which the court refuses to enforce the National Labor Relations Board's order, based as it was on the old (*Res Care*) rule. However, I respectfully dissent from part IV in which the majority determines in the first instance that the new (*Management Training*) rule should not be applied retroactively in this case. I do so because controlling precedent requires that we remand to the Board so that it can determine in the first instance if a new Board rule is to be applied retroactively.

More than twenty years ago, when considering another NLRB case, the Supreme Court, in a unanimous decision, directed:

> [A] *court reviewing an agency decision following an intervening change of policy by the agency should remand to permit the agency to decide in the first instance whether giving the change retrospective effect will best effectuate the policies underlying the agency's governing act.*

*NLRB v. Food Store Employees Union*, 417 U.S. 1, 10 n. 10, 94 S.Ct. 2074, 2080 n. 10, 40 L.Ed.2d 612 (1974) (emphasis added). Thus, the Court held that "if the Court of Appeals correctly read [a recent NLRB decision] as having signaled a change of policy ... a remand was necessary, because the Board should be given the first opportunity to determine whether the new policy should be applied retroactively." *Id.* at 10, 94 S.Ct. at

2080. The Supreme Court has never overruled, modified, or in any way retreated from its position in *Food Store Employees*.*

Furthermore, in *Blackman–Uhler Chem. Div., Synalloy Corp. v. NLRB*, 561 F.2d 1118 (4th Cir.1977) (*en banc*) (per curiam), this court, in a unanimous *en banc* decision, expressly followed *Food Store Employees*. We held that when the NLRB adopted a new rule after its decision in the underlying case, we were *required* pursuant to *Food Store Employees* to "remand the case to the Board for a determination of whether the [new] rule ... is applicable to the instant case." *Id.* at 1119. Like the Supreme Court, we have never suggested that the principle enunciated in *Food Store Employees* is subject to any exception or modification. Rather, our decisions consistently acknowledge that this principle is mandatory and applies without exception. *See, e.g., National Posters, Inc. v. NLRB*, 720 F.2d 1358, 1363–64 (4th Cir.1983) ("[w]here, as here, there is an intervening change of agency policy, the central question is 'whether giving the change retrospective effect will best effectuate the policies underlying the agency's governing act,' and *that question is committed, in the first instance,* to the agency's sound discretion") (emphasis added); *Cedar Coal Co. v. NLRB*, 678 F.2d 1197, 1199 (4th Cir.1982) ("[r]emand of this case ... is ... *mandated by [Food Store Employees ]*") (emphasis added); *NLRB v. Cambridge Wire Cloth Co.*, 622 F.2d 1195, 1200 (4th Cir.1980) (*Food Store Employees* and *Blackman–Uhler* require remand to

a serious impropriety on parties who pattern their behavior under the prior announced standards. As the Supreme Court warned in *Landgraf v. USI Film Products*, — U.S. —, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994): "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* at —, 114 S.Ct. at 1497.

* Significantly, in indicating that remand to the NLRB for its retroactivity determination was necessary, the Court in *Food Store Employees*, citing *Bradley v. School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), described this course as an exception to the general principle that "[a]ppellate courts ordinarily apply the law in effect at the time of the appellate decision." *Id.* at 10 n. 10, 94 S.Ct. at 2080 n. 10. In *Bradley*, decided just five days

prior to *Food Store Employees*, the Court had explored in great detail another exception to the general principle—the very exception relied on by the majority in this case—that is, the law in effect at the time of the appellate decision is not to be applied if to do so "would result in manifest injustice." *Bradley*, 416 U.S. at 711–21, 94 S.Ct. at 2016–21. Having so recently decided *Bradley*, the Supreme Court was certainly well aware of *Bradley* 's exception for "manifest injustice." Had the Court intended to include the *Bradley* exception for manifest injustice in the principle announced in *Food Store Employees*, it would have expressly done so. Its failure to do so precludes us, absent later Supreme Court direction (and there has been no such direction), from using the "manifest injustice" exception *prior* to agency determination as to whether its rule is to be applied retroactively.

Board in the first instance to determine if new rule should be applied retroactively).

Accordingly, it is not merely, as the majority states, that it "may be appropriate" to remand to the Board "when [it] has not made it clear whether it intends for a new rule to apply retroactively," Maj. Op. at 135; rather, this course is mandatory. There is simply no Supreme Court or Fourth Circuit precedent for *not* remanding to the Board so that it can determine *in the first instance* if its new rule should be applied retroactively. Moreover, the *Food Store Employees* principle is entirely consistent with, indeed virtually required by, the recognized primacy Congress has bestowed on the National Labor Relations Board with respect to its own rules. *See e.g., Garner v. Teamsters, Chauffeurs, and Helpers Local Union No. 776,* 346 U.S. 485, 490, 74 S.Ct. 161, 165, 98 L.Ed. 228 (1953) (Congress vested the NLRB, "a specific and specially constituted tribunal," with "primary interpretation and application of its rules"). The majority may disagree with the *Food Store Employees* principle; it is, to be sure, a conservative principle. However, disagreement provides no basis for refusing to follow a directive of the Supreme Court and controlling precedent of this Court. Rather, this is precisely what is required by faithful application of the rule of law.

In light of the above controlling authority, cases from other jurisdictions are of little relevance here. However, it is worth noting that not even the out-of-circuit authority relied on by the majority support its holding that a reviewing court can refuse to remand for the Board's determination, in the first instance, on the retroactivity question. For example, *NLRB v. Viola Industries–Elevator Div., Inc.,* 979 F.2d 1384, 1396 (10th Cir.1992) (*en banc*) does *not* hold, or even suggest, that a reviewing court "need not remand if applying the new jurisdictional rule retroactively would work a 'manifest injustice.'" Maj. Op. at 135. The *Viola* court did not refuse to remand because it found application of a new NLRB rule would be unjust. Nor did it state or imply that a reviewing court could *in the first instance* determine if a new NLRB rule is unjust. Rather, in *Viola,* the Tenth Circuit simply held that *after* the

Board has determined that it will apply a new rule retroactively, a reviewing court should uphold that determination unless "manifest injustice would result." *Id.* at 1396. The *Viola* court found that the Board's retroactive application of the new rule did not result in a manifest injustice and so affirmed that application. *Id.* at 1397. ("We hold that the Board appropriately applied the [new] rule retroactively in this case.")

Similarly, none of the other cases discussed in the majority opinion support the conclusion that a reviewing court can determine if retroactive application of a new NLRB rule would work a manifest injustice *before* any Board determination on this point. Instead, all of these cases describe the standards to be used by a reviewing court *after* the Board has determined in the first instance that the new rule will be applied retroactively. In one of the cited cases, the court expressly remanded to the Board to make this initial determination. *Retail, Wholesale and Dept. Store v. NLRB,* 466 F.2d 380, 389–90 (D.C.Cir.1972). In the remaining cases, *after* the Board applied a new rule retroactively, the reviewing court refused to enforce the Board's retroactive application, *NLRB v. Oakes Machine Corp.,* 897 F.2d 84, 90 (2d Cir.1990), or, more usually, upheld the Board's retroactive application in whole or in part. *UFCW Local No. 150–A v. NLRB,* 1 F.3d 24, 34 (D.C.Cir.1993); *District Lodge 64 v. NLRB,* 949 F.2d 441, 447 (D.C.Cir.1991); *Consolidated Freightways v. NLRB,* 892 F.2d 1052, 1059 (D.C.Cir.1989), *cert. denied,* 498 U.S. 817, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990); *General Am. Transp. Corp. v. ICC,* 872 F.2d 1048, 1060 (D.C.Cir. 1989), *cert. denied,* 493 U.S. 1069, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990); *Local 900 v. NLRB,* 727 F.2d 1184, 1194–95 (D.C.Cir. 1984); *NLRB v. Affiliated Midwest Hosp. Inc.,* 789 F.2d 524, 530 (7th Cir.1986).

The majority's decision to usurp the Board's role by determining in the first instance if a new Board rule should be applied retroactively disrupts the orderly process of administrative litigation. Such a decision is thus not only contrary to *Food Store Employees, Blackman–Uhler, National Posters,*

*Cedar Coal* and *Cambridge Wire Cloth*, it is also contrary to one of the most fundamental rules of administrative law:

> That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.

*Securities & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). For this reason, other courts have remanded the retroactivity question for Board determination in the first instance, even in cases that had already consumed more time than that involved in this case. *See, e.g., NLRB v. Coca–Cola Bottling Co. of Buffalo, Inc.*, 55 F.3d 74, 78 (2d Cir. 1995) (five years); *United Food & Commercial Workers Int'l. Union v. NLRB*, 880 F.2d 1422, 1423–27 (D.C.Cir.1989) (four years).

Indicative of just how contrary the majority's holding is to controlling precedent, not even the employer, which so mightily benefits from it, maintains that this is the proper course. Although the employer, ARA Services, Inc., does argue that application of the new rule would be "manifestly unjust" and urges us not to apply it, ARA never asserts that it is inappropriate for the Board to make the retroactivity *vel non* determination in the first instance. Indeed, ARA cites and quotes *Food Store Employees* and our cases following it and concedes that the Board "must have the opportunity to express its opinion on retroactivity." ARA Supplemental Brief at 8. The Board has never been given this opportunity. It certainly has never found that retroactive application of its new rule is appropriate in this case.

If given the opportunity, the Board might conclude, as the majority does, that retroactive application of the new rule in this case would result in manifest injustice. On the other hand, if presented with this opportunity, the Board, which is more familiar with the National Labor Relations Act and its underlying policies than any court can ever be, *see Garner*, 346 U.S. at 488–92, 74 S.Ct. at 164–66, might conclude, perhaps on the basis of facts not known or not considered by the majority, that retroactive application is ap-

propriate. In any event, as the employer has conceded, the Board should be given this opportunity. (If lapse of time is a consideration, the Board could be ordered to do this within thirty or sixty days. *See Coca–Cola*, 55 F.3d at 78). After the Board has made its determination as to retroactivity, if dissatisfied, the employer could then seek review in this court. At that time, we would be able to consider the factors set forth in the majority opinion in light of a fully developed record—including the Board's own reasoning as to the retroactive application of the new rule to this case. The majority's unauthorized shortcut puts the judicial decision cart before the administrative decision horse.

For these reasons, I respectfully dissent from Part IV of the majority opinion. I would remand the case to the Board so that it could determine in the first instance whether its new rule should be applied retroactively in this case.